IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2014 Term

_____

No. 13-0099

_____

**FILED**

**June 17, 2014**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

GARY LEE ROLLINS,
Defendant Below, Petitioner

_____

Appeal from the Circuit Court of Nicholas County
The Honorable Gary L. Johnson, Judge
Criminal Action No. 11-F-81

AFFIRMED

_____

Submitted: January 22, 2014
Filed: June 17, 2014

W. Brad Dorsey, Esq.
Callaghan & Callaghan, PLLC
Summersville, West Virginia
Counsel for the Petitioner

Patrick Morrisey, Esq.
Attorney General
Christopher S. Dodrill, Esq.
Assistant Attorney General
Charleston, West Virginia
Counsel for the Respondent

The Opinion of the Court was delivered PER CURIAM.

JUSTICE WORKMAN, JUSTICE KETCHUM and JUSTICE LOUGHRY concur and reserve the right to file separate opinions.

SYLLABUS BY THE COURT

1.      "A judgment of conviction will not be set aside because of improper remarks made by a prosecuting attorney to a jury which do not clearly prejudice the accused or result in manifest injustice." Syl. pt. 5, *State v. Sugg*, 193 W. Va. 388, 456 S.E.2d 469 (1995).

2.      "If either the prosecutor or defense counsel believes the other has made improper remarks to the jury, a timely objection should be made coupled with a request to the court to instruct the jury to disregard the remarks." Syl. pt. 5, in part, *State v. Grubbs*, 178 W. Va. 811, 364 S.E.2d 824 (1987).

3.      "Failure to make timely and proper objection to remarks of counsel made in the presence of the jury, during the trial of a case, constitutes a waiver of the right to raise the question thereafter either in the trial court or in the appellate court." Syl. pt. 6, *Yuncke v. Welker*, 128 W. Va. 299, 36 S.E.2d 410 (1945).

4.      ""'An appellant or plaintiff in error will not be permitted to complain of error in the admission of evidence which he offered or elicited, and this is true even of a defendant in a criminal case." Syl. Pt. 2, State v. Bowman, 155 W.Va. 562, 184 S.E.2d 314 (1971).' Syl. Pt. 1, State v. Compton, 167 W.Va. 16, 277 S.E.2d 724 (1981)." Syl. pt. 3, *State v. Crabtree*, 198 W. Va. 620, 627, 482 S.E.2d 605, 612 (1996).

i

5. "A trial court's failure to remove a biased juror from a jury panel, as required by W. Va.Code § 62-3-3 (1949) (Repl.Vol.2010), does not violate a criminal defendant's right to a trial by an impartial jury if the defendant removes the juror with a peremptory strike. In order to obtain a new trial for having used a peremptory strike to remove a biased juror from a jury panel, a criminal defendant must show prejudice. The holding in Syllabus point 8 of *State v. Phillips*, 194 W.Va. 569, 461 S.E.2d 75 (1995), is expressly overruled." Syl. pt. 3, *State v. Sutherland*, 231 W. Va. 410, 745 S.E.2d 448 (2013).

6. "Where an offer of evidence is made under Rule 404(b) of the West Virginia Rules of Evidence, the trial court, pursuant to Rule 104(a) of the West Virginia Rules of Evidence, is to determine its admissibility. Before admitting the evidence, the trial court should conduct an *in camera* hearing as stated in *State v. Dolin*, 176 W.Va. 688, 347 S.E.2d 208 (1986). After hearing the evidence and arguments of counsel, the trial court must be satisfied by a preponderance of the evidence that the acts or conduct occurred and that the defendant committed the acts. If the trial court does not find by a preponderance of the evidence that the acts or conduct was committed or that the defendant was the actor, the evidence should be excluded under Rule 404(b). If a sufficient showing has been made, the trial court must then determine the relevancy of the evidence under Rules 401 and 402 of the West Virginia Rules of Evidence and conduct the balancing required under Rule 403 of the West Virginia Rules of Evidence. If

the trial court is then satisfied that the Rule 404(b) evidence is admissible, it should instruct the jury on the limited purpose for which such evidence has been admitted. A limiting instruction should be given at the time the evidence is offered, and we recommend that it be repeated in the trial court's general charge to the jury at the conclusion of the evidence." Syl. pt. 2, *State v. McGinnis*, 193 W. Va. 147, 455 S.E.2d 516 (1994).

7. "Assuming that an error is 'plain,' the inquiry must proceed to its last step and a determination made as to whether it affects the substantial rights of the defendant. To affect substantial rights means the error was prejudicial. It must have affected the outcome of the proceedings in the circuit court, and the defendant rather than the prosecutor bears the burden of persuasion with respect to prejudice." Syl. pt. 9, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995).

8. "As to the balancing under Rule 403 [of the West Virginia Rules of Evidence], the trial court enjoys broad discretion. The Rule 403 balancing test is essentially a matter of trial conduct, and the trial court's discretion will not be overturned absent a showing of clear abuse." Syl. pt. 10, in part, *State v. Derr*, 192 W. Va. 165, 451 S.E.2d 731 (1994).

9. "Third-party testimony regarding an out-of-court identification may in certain circumstances be admissible when the identifying witness testifies at trial

because both the identifying witness and the third party are then available for cross-examination." Syl. pt. 6, *State v. Carter*, 168 W. Va. 90, 282 S.E.2d 277 (1981).

10. "It is within a trial court's discretion to admit an out-of-court statement under Rule 803(1), the present sense impression exception, of the West Virginia Rules of Evidence if: (1) The statement was made at the time or shortly after an event; (2) the statement describes the event; and (3) the event giving rise to the statement was within a declarant's personal knowledge." Syl. pt. 4, *State v. Phillips*, 194 W. Va. 569, 461 S.E.2d 75 (1995), *overruled on other grounds by State v. Sutherland*, 231 W. Va. 410, 745 S.E.2d 448 (2013).

11. "Under the requirements of the Confrontation Clause contained in the Sixth Amendment to the United States Constitution, evidence offered under the residual hearsay exceptions contained in Rule 803(24) and Rule 804(b)(5) of the West Virginia Rules of Evidence is presumptively unreliable because it does not fall within any firmly rooted hearsay exception, and, therefore, such evidence is not admissible. If, however, the State can make a specific showing of particularized guarantees of trustworthiness, the statements may be admissible. In this regard, corroborating evidence may not be considered, and it must be found that the declarant's truthfulness is so clear that cross-examination would be of marginal utility." Syl. pt. 6, *State v. James Edward S.*, 184 W. Va. 408, 400 S.E.2d 843 (1990), *overruled on other grounds by State v. Mechling*, 219 W. Va. 366, 633 S.E.2d 311 (2006).

12.     "'The action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion.' Syllabus point 10, *State v. Huffman*, 141 W.Va. 55, 87 S.E.2d 541 (1955), *overruled on other grounds by State ex rel. R.L. v. Bedell*, 192 W.Va. 435, 452 S.E.2d 893 (1994)." Syl. pt. 2, *State v. Doonan*, 220 W. Va. 8, 640 S.E.2d 71 (2006).

13.     "The West Virginia Rules of Evidence and the West Virginia Rules of Civil Procedure allocate significant discretion to the trial court in making evidentiary and procedural rulings. Thus, rulings on the admissibility of evidence and the appropriateness of a particular sanction for discovery violations are committed to the discretion of the trial court. Absent a few exceptions, this Court will review evidentiary and procedural rulings of the circuit court under an abuse of discretion standard." Syl. pt. 1, *McDougal v. McCammon*, 193 W. Va. 229, 455 S.E.2d 788 (1995).

14.     "In order to preserve for appeal the claim of unfair surprise as the basis for the exclusion of evidence, the aggrieved party must move for a continuance or recess." Syl. pt. 4, *McDougal v. McCammon*, 193 W. Va. 229, 455 S.E.2d 788 (1995).

15.     "Where the record of a criminal trial shows that the cumulative effect of numerous errors committed during the trial prevented the defendant from

receiving a fair trial, his conviction should be set aside, even though any one of such errors standing alone would be harmless error." Syl. pt. 5, *State v. Smith*, 156 W. Va. 385, 193 S.E.2d 550 (1972).

Per Curiam:

This case is before the Court on appeal by the petitioner, Gary Lee Rollins, of the December 18, 2012, order of the Circuit Court of Nicholas County convicting Mr. Rollins of first degree murder of his wife, Teresa Rollins. He did not receive a recommendation of mercy. After a thorough review of the record presented for consideration, the briefs, the legal authorities cited, and the arguments of parties, we find that the circuit court did not commit any reversible error. Therefore, we affirm Mr. Rollins's conviction.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

On October 5, 2009, Ms. Rollins's dead body was found pinned underwater in a pond by a fallen tree.[1] The pond is located on property owned by her and her husband, Mr. Rollins, in Nettie, West Virginia. Mr. and Ms. Rollins made their living by farming vegetables on the property.

According to Mr. Rollins, he last saw Ms. Rollins alive on the morning of October 5, 2009, around 7:30 a.m. He claimed that she was preparing to set out

---

[1] Expert testimony at trial indicated that the tree was approximately sixty feet tall and a thousand pounds. The stump of the tree was located about thirty-five feet from the edge of the pond. Ms. Rollins's body was trapped under the branches of the tree.

1

Halloween decorations as he left to clear a path on the property where he liked to hunt deer. Around 9:00 a.m., Mr. Rollins returned to the house to wait for the family's hired help for the farm—Tanya Wagner, April Bailes, and Kay Rudd—to arrive. Upon their arrival, the three women and Mr. Rollins proceeded to work in the fields. At approximately 11:30 a.m., all four broke for lunch.

While the women and Mr. Rollins had lunch together, Ms. Rudd asked about the whereabouts of Ms. Rollins. Mr. Rollins told Ms. Rudd that he would go look for his wife. Mr. Rollins stated that he checked places where he thought she might be: the storage building and inside the home. After failing to find her there, he stated that he went to look for her near the corn field because he believed she might be collecting corn stalks to decorate the front porch. It was while he was near the corn field that he claimed to have first seen his wife's body under a fallen tree in the pond:

> And so that's when I went down by my transformer there, and I walked down to the corn. I was lookin' down the rows to see. Well, she's in there sneakin' some more corn stalks up after I told her not to, but I didn't see her.
> So I was lookin', and I just noticed the tree, and I was kinda lookin' out at the corn and lookin' there, and I -- I kept lookin', and I said, "What in the shit is that?" I just -- Looked like something. I wasn't for sure. I was at a different angle -- . . . from what we were up there, and I took a few more steps down there, and I could tell there was something in the water. Well, it just -- Kinda one and one hit me. I said, "Oh, my God[.]"

2

Mr. Rollins later described the scene, stating that his wife's body was held under water by a large branch on the tree about two feet from the edge of the pond.

Mr. Rollins stated that upon seeing his wife under the tree, he ran down into the pond and attempted to pull her body free. When he was unsuccessful, he ran to the house where the workers were eating, shouting, "Call an ambulance. Call an ambulance." He then ran back down the hill to his tractor, followed by Ms. Wagner. Ms. Bailes retrieved her cell phone from her vehicle and called 911, telling the operator that Ms. Rollins was trapped in the pond and was not breathing.

Mr. Rollins drove his tractor down to the pond. He attempted to use the tractor to lift the tree off of Ms. Rollins's body, but because the tree was too heavy to lift he used the tractor to push the tree off of her instead. Ms. Wagner jumped into the pond and dragged the body from the water. Mr. Rollins helped Ms. Wagner pull the body out of the water and onto the bank. Ms. Wagner attempted CPR with no success.

Medical emergency personnel arrived shortly thereafter, and police with the Nicholas County Sheriff's Department arrived about half an hour later. Some of the Rollins's neighbors went to the house upon seeing the emergency vehicles, and Deputy Kenneth Sales of the Sheriff's Department took statements from the neighbors, the workers, and Mr. Rollins. Mr. Rollins told Deputy Sales that he believed his wife may

3

have gone down to the pond to feed bread to fish or squirrels, and that the tree had fallen while she was there and pinned her under the water. Deputy Sales also took pictures of the scene.

Ms. Rollins's body underwent an autopsy the next day, October 6, 2009. Dr. Zia Sabet of the State Medical Examiner's Office, upon examining the body, found a few small scratches on Ms. Rollins's face and some bruising on her back. The death certificate prepared at that time stated that the cause and manner of death were both "pending investigation."

Deputy Sales acted as lead investigator of the circumstances surrounding Ms. Rollins's death. He returned to the Rollins property on October 7, 2009, to take additional photographs. At that time, the fallen tree had been removed from the pond, and the record in this case does not reflect the location of the tree following its removal from the pond.

On October 13, 2009, Deputy Sales requested that Mr. Rollins meet him at the Nicholas County Courthouse to speak with him again about Ms. Rollins's death.[2]

---

[2] Before questioning Mr. Rollins, Deputy Sales informed Mr. Rollins of his rights pursuant to requirements of *Miranda v. Arizona*, 384 U.S. 436 (1965) (requiring that upon taking a person into custody, the police must inform that person that, among other
(continued . . .)

4

The interview was video recorded. Before the interview commenced, Deputy Sales told Mr. Rollins, "From the circumstances of this case, we have changed it to a murder investigation; so right now you're being questioned about a murder . . . ." Deputy Sales informed Mr. Rollins that the circumstance that had arisen prompting the interview was the discovery of Mr. Rollins's extramarital affair with Ms. Bailes:

> DEPUTY SALES: Yeah. The circumstances that came up, that arose since then --
> MR. ROLLINS: Okay.
> DEPUTY SALES: -- you know, with the affair and everything.
> MR. ROLLINS: Oh, yeah.
> DEPUTY SALES: Yeah. I mean --
> MR. ROLLINS: Well, you guys call it an affair, but -- That's fine. I mean, yeah, I was kinda seein' a woman --
> DEPUTY SALES: Well, I mean, what else would it be?
> MR. ROLLINS: A fling.
> DEPUTY SALES: A fling. For over a year?[3]
> MR. ROLLINS: Extra-marital affair.
> . . . .
> MR. ROLLINS: I understand that everybody sees on TV when there's a death and there's an affair goin' on, another woman, the first thing they suspect is the spouse. I understand that.

---

things, he/she has the right to remain silent). At the time of the interview, Mr. Rollins was not under arrest and he was informed that he was free to leave at any time. He signed the *Miranda* interview form, waiving his *Miranda* rights.

[3] Mr. Rollins and Ms. Bailes began their affair in July 2008. The affair continued after Ms. Rollins's death and through the incarceration of Mr. Rollins, ending in December 2010.

DEPUTY SALES: And a jury would just absolutely hammer you.

MR. ROLLINS: They would probably be eatin' it like a piece of candy, lookin' at me, sayin, "Oh boy, he had to have done it."

(Footnote added). Deputy Sales continued the interview by questioning Mr. Rollins again as to the events occurring on the day his wife was found dead. Upon the conclusion of his questions, the following discussion took place between the two men:

DEPUTY SALES: All right. Well, if Dan [another investigating police officer] thinks of somethin', then he'll give you a call or anything. I can't think of anything else. We've went over it a few times now.

MR. ROLLINS: Okay. Well, I'm -- I'll tell you the truth. I think once you guys get the -- all the reports back from the autopsy --

DEPUTY SALES: Um-hum.

MR. ROLLINS: -- and it shows there wasn't no toxins in her system, and it shows that she drowned in a pond, and it shows that a tree -- that tree and stuff hit her, I -- I think you guys might be a little bit more at ease, because I'm -- Yeah, that's -- that's how she died. She -- Nobody killed my wife.

DEPUTY SALES: Okay.

MR. ROLLINS: I mean, nobody -- nobody could. I mean, she might complain and she might have been hard to get along with sometimes, but she had a heart of gold, and nobody could do that to somebody like that.

. . . .

MR. ROLLINS: I've -- I've questioned myself, you know, why -- why she didn't, you know, hear that and get out of the way or something, and --

And I don't like talkin' bad about anybody because, you know, I love my wife. She was -- Like I said, just a heart of gold, but she was slow as far as thinkin'. She -- No numbers, no spelling, no nothin'. I mean, when it come to that, she'd always come to me, and you'd tell her something, she'd -- It was like tellin' a person a joke. Well, a half hour

6

later, she'd start laughin'. She'd get it. She was just slow. It's just --

And -- And I always thought, well, if a tree would -- would break, and she probably would have turned around and looked and says, "Oh, a tree fallin'," and then -- She's that type.

Following the investigation by Deputy Sales, the doctor who performed the autopsy on Ms. Rollins, Dr. Sabet, concluded that Ms. Rollins's death was an accident and the result of "drowning complicated compression asphyxia." The Chief Medical Examiner, Dr. James Kaplan, upon reviewing Dr. Sabet's findings, agreed with this conclusion. An amended death certificate was issued on October 20, 2009, reflecting the manner of death—"accident"—and cause of death—"drowning complicated compression asphyxia." The State Medical Examiner's Office issued an autopsy report containing the same findings as the amended death certificate on January 10, 2010.

According to Mr. Rollins, Ms. Rollins's family contacted then Govenor Joe Manchin about the investigation, indicating their belief that Ms. Rollins's death was the result of murder, not accident. The record indicates that former Governor Manchin then called the head of the West Virginia State Police and instructed the State Police to conduct an investigation. Upon completing their investigation, the State Police concluded that Ms. Rollins's death was *not* an accident.

7

First, the State Police discovered that Mr. Rollins had taken out two life insurance policies on his wife's life within two months of her death. On August 29, 2009, a little more than a month before Ms. Rollins died, Mr. Rollins went truck shopping with his girlfriend, Ms. Bailes. The salesman testified that while on the lot looking at cars, before negotiating a deal on a vehicle, Mr. Rollins asked about life insurance options sold by the dealership. The salesman stated that in his experience it was uncommon for prospective buyers to discuss insurance options prior to deciding on a vehicle to purchase. Mr. Rollins ultimately purchased a truck for $44,255.82, financing the majority of the purchase price. The salesman testified that Mr. Rollins said that "he'd be paying it off pretty soon" but that the financing period Mr. Rollins selected—60 months—was not the shortest the dealership offered. Mr. Rollins also purchased life insurance to cover the cost of the truck, up to $50,000. The policy covered both his life and the life of his wife. Another representative of the dealership testified that because Ms. Rollins was named on the loan, she appeared in a day or two following the sale to sign paperwork including the life insurance document.

On September 4, 2009, thirty days before Ms. Rollins died, Mr. Rollins made a call to increase his and his wife's life insurance coverage. He increased his coverage by $300,000. He attempted to increase Ms. Rollins's coverage by $300,000 as well, for both natural and accidental death causes, but he was informed by the agent that to cover natural death, Ms. Rollins would need a new physical because of her previously

8

disclosed cholesterol issues. Mr. Rollins ultimately decided to forego the health portion of the insurance, stating, "Yeah, because all I'm looking for is just the accidental," and, "We're not trying to increase life when neither one of us is planning -- planning a natural death for at least another 30 to 40 years." Mr. Rollins stated that the reason he wanted to purchase additional insurance was "because we were under the assumption that our mortgage was insured also . . . so basically what we're covered in now will just barely pay off our mortgage." The total coverage for each spouse with the respective $300,000 increases was $500,000.

Second, the State Police found Ms. Bailes's phone call to 911 on October 5, 2009, highly suspicious. According to the statements of all witnesses present at the Rollinses' farm, upon discovering Ms. Rollins's body, Mr. Rollins ran up the hill shouting for someone to call an ambulance. At that time, Mr. Rollins did not explain why they should call an ambulance. Ms. Bailes made the 911 call after retrieving her phone from her vehicle. The point from which she made the call was approximately eighty-five yards from where Ms. Rollins lay in the pond, yet she told the 911 operator that Ms. Rollins was trapped under a tree in the pond and that Ms. Rollins was not breathing. The State Police theorized that because Ms. Bailes could not see the scene at

the pond with the detail she described to the 911 operator, she must have known that Ms. Rollins was dead in the pond prior to placing the call.[4]

Third, the State Police also found Mr. Rollins's statements to Deputy Sales suspicious. Mr. Rollins's claim that he jumped into the pond in an attempt to save his wife did not match the testimony of witnesses on the scene. Those witnesses described Mr. Rollins as being either completely dry or wet only up to his knees shortly after Ms. Rollins's body was removed from the pond. Based on these statements, the State Police did not believe that Mr. Rollins was wet enough to support his claim that he had jumped into the pond and attempted to pull his wife's body free from beneath the tree.

Representatives of the State Police then met with Dr. Sabet and Dr. Kaplan on January 14, 2010, presenting their evidence and theories. Based on the new information, Drs. Sabet and Kaplan decided to amend their previous findings, changing Ms. Rollins's death certificate to state that the cause of death was "asphyxia due to probable strangulation" and the manner of death was "undetermined." The amended death certificate was filed on January 19, 2010. The autopsy report was also later amended and filed on July 19, 2010.

---

[4] Ms. Bailes testified at trial that she was unable to see if Ms. Rollins was breathing from her vantage point when she talked to the 911 operator.

In September of 2011, Mr. Rollins was indicted for the murder of his wife, and he was subsequently arrested. Ms. Bailes was arrested on October 7, 2011, as an accessory to that murder based on the belief that Ms. Bailes must have known that Ms. Rollins was dead prior to calling 911.

In the two years after Ms. Rollins's death, Ms. Bailes denied any knowledge of foul play; however, shortly after her arrest, on October 13, 2011, Ms. Bailes informed the police that Mr. Rollins had taken her aside on the morning of October 5, 2009, and told her that he had killed his wife. She testified:

> We unloaded the stakes, and he had took me by the arm to the other side of the tractor, and he just looked at me like -- with this look like he was looking through me, and he just said, "I -- I killed Teresa."
> And I just looked at him, you know, like "What?"
> And he said it again. He said, "I killed Teresa," and he said that I'd be the one to call 911 and tell them about her under the tree, and that if I didn't go along with it, that me and my daughter wouldn't be here.

Ms. Bailes also stated that prior to Ms. Rollins's death, Mr. Rollins "talked about when he got rid of Teresa, and he mentioned, like, marriage once I think."

In preparation for trial, a second autopsy was performed in May 2012 on Ms. Rollins's body by an expert for the State, Dr. Cyril Wecht, and an expert for the defense, Dr. Joseph Cohen. Neither Dr. Wecht nor Dr. Cohen was employed by the State of West Virginia. In addition to conducting a similar inspection of the areas of the body

11

examined by Dr. Sabet during the first autopsy, Drs. Wecht and Cohen removed the spinal column and spinal cord to look for injuries. Dr. Wecht concluded that Ms. Rollins died as a result of forcible drowning. Dr. Cohen concluded that the injuries were consistent with being pinned under water by a fallen tree.

Mr. Rollins's trial began on August 14, 2012. In addition to Ms. Bailes' testimony that Mr. Rollins had confessed to her that he had killed his wife, testimony associated with the life insurance policies, and testimony of witnesses present on the Rollins farm on October 5, 2009, the State presented the testimony of three medical expert witnesses: Drs. Sabet and Kaplan of the State Medical Examiner's Office, and Dr. Wecht. All three experts testified that they did not believe the injuries to Ms. Rollins's body were extensive enough to have been caused by a falling tree. The State also presented the testimony of a friend of Ms. Rollins who claimed that Mr. Rollins had physically abused his wife in the months preceding her death.

The defense contended that Ms. Rollins's death was an accident and that the former governor's influence had caused the police and medical examiners to wrongfully accuse Mr. Rollins of murder. The defense presented the testimony of Dr. Cohen who stated that he believed a falling tree could have caused Ms. Rollins's death. All four of the medical expert witnesses at trial—the State's three witnesses and the defense's one witness—agreed that Ms. Rollins's body did not present with any large

12

hemorrhages or broken bones. They also agreed that based on her wounds, the tree could not have knocked her unconscious and that she was conscious when she was submerged in the water. The witnesses disagreed primarily on the amount of bruising on Ms. Rollins's back and in their ultimate conclusions.

After the presentation of closing arguments, the jury retired to the jury room at approximately 3:45 p.m. for deliberation. The jury returned to the courtroom at approximately 5:10 p.m. with its verdict. The jury found Mr. Rollins guilty of first degree murder, and it did not recommend mercy. At the request of the defense, the jury was polled. Each juror indicated that the verdict form accurately depicted his or her individual vote of guilt.

The circuit court entered a Trial Order on December 18, 2012, finding Mr. Rollins guilty of the first degree murder of his wife. Following a sentencing hearing on September 26, 2012, Mr. Rollins was sentenced to life imprisonment without mercy. Mr. Rollins now appeals his murder conviction to this Court.

## II.

### STANDARD OF REVIEW

On appeal, Mr. Rollins raises seven assignments of error. Because this case requires the examination and application of numerous standards of review to the

assignments of error, we will discuss each of the appropriate standards in conjunction with our analysis of the individual issues below.

**III.**

**ANALYSIS**

As stated above, Mr. Rollins raises seven assignments of error. He argues that he was prejudiced by a remark made by the prosecutor during closing arguments; that the circuit court erred by refusing to strike a juror during voir dire; that the circuit court erred by failing to strike a biased juror upon discovering a previous relationship between that juror and the prosecutor; that the circuit erroneously permitted the presentation of evidence of domestic violence; that the State's presentation of three medical expert witnesses was cumulative and prejudicial; that he was subjected to unfair surprise when one of the State's medical expert witnesses, Dr. Kaplan, testified in a manner inconsistent with his report; and that the cumulative effect of the errors in the case warrants reversal of his conviction. For the reasons explained in full below, we conclude that the circuit court did not commit any reversible error.

**A. The prosecutor's remark**

During his rebuttal argument, the prosecutor made a comment that Mr. Rollins alleges was a material misrepresentation, resulting in substantial prejudice and manifest injustice. The statement at issue was given during the State's rebuttal. The State

14

argues that the prosecutor's comment was a permissible response to the defense's closing

argument. The defense said during its closing argument:

> So where does this little -- little lie, big lie, giant lie, the lie that they're trying to make my client's life with, where does that leave [Ms. Bailes]? What does she gain from that 15 seconds of fabrication?
>
> She's joined their team. She's gotten on the -- the governor's freight train express. We're all going to railroad Gary Rollins, so now what does she get out of it. She's not in jail. She's not been indicted. You heard that she was arrested. She was taken before a magistrate, but she's not been indicted. You can't get convicted if you're not indicted.
>
> Who hands out the indictments? That man right there. (Indicated.) P.K. Milam [the prosecutor]. Is he going to indict his star witness, do you think? Is that what's really going to happen here? After all is said and done, he gets his conviction thanks to her lie, he's going to repay that by indicting her? Do you think they thought that?
>
> . . . .
>
> And she knew what they wanted her to say because they'd been trying to get her to say it for two years, and they couldn't do it until they put the cuffs on her. She knew what they wanted. In the end, she gave it to them for her freedom.

During the State's rebuttal, the prosecutor told the jury:

> Mr. Vanbibber [defense counsel] wants you to believe that [Ms. Bailes is] getting out of trouble for telling us the truth. Trp. White [of the State Police], when he interviewed her, told her -- said you can either tell us the truth now or we'll arrest you later, and he made good on that promise, because we knew from the very beginning, from that 911 call, that she could not have had that information. That's what broke this case wide open. Reviewing that tape shows that she could not have that information from the get-go, and we interviewed her again and again and again and gave her every opportunity in the world to help herself, and she didn't, and

15

she got arrested for it, and she's charged with accessory after the fact.

Now, he wants you to believe that she's getting some kind of consideration out of that. *You can bet your behind that I'm going to indict her next month.*

If she'd told us this from the beginning, two years ago, three years ago now, this case would have been totally different, but she held that information in -- in her pocket for two years, and she didn't anyone [sic] until she was in trouble, and she tried to save her own behind. Well, it's too late at that point. She's being prosecuted as an accessory after the fact in this case.

(Emphasis added).

Mr. Rollins argues that the prosecutor's assertion that he would indict Ms. Bailes improperly bolstered Ms. Bailes's credibility. Despite Ms. Bailes's testimony that she had not been promised anything by the State with regard to her trial testimony, Mr. Rollins contends in this appeal that Ms. Bailes was the State's "star witness" at trial and that the prosecutor's statement regarding Ms. Bailes's credibility prejudiced his case.

When reviewing the propriety of remarks made to the jury by the prosecutor, the Court has held that "[a] judgment of conviction will not be set aside because of improper remarks made by a prosecuting attorney to a jury which do not clearly prejudice the accused or result in manifest injustice." Syl. pt. 5, *State v. Sugg*, 193 W. Va. 388, 456 S.E.2d 469 (1995). *See also* syl. pt. 1, *State v. Dunn*, 162 W. Va. 63, 246 S.E.2d 245 (1978) ("A judgment of conviction will not be reversed because of improper remarks by a prosecuting attorney in his opening statement to a jury which do not clearly

16

prejudice the accused or result in manifest injustice."); *State v. Coulter*, 169 W. Va. 526, 530, 288 S.E.2d 819, 821 (1982) (applying syllabus point 1 of *Dunn* to an evaluation of a prosecuting attorney's closing argument). The Court has also recognized that a trial court exercises reviewable discretion when ruling on the propriety of a prosecuting attorney's comments to the jury. *State v. Painter*, 135 W. Va. 106, 112, 63 S.E.2d 86, 91 (1950).

"If either the prosecutor or defense counsel believes the other has made improper remarks to the jury, a timely objection should be made coupled with a request to the court to instruct the jury to disregard the remarks." Syl. pt. 5, in part, *State v. Grubbs*, 178 W. Va. 811, 364 S.E.2d 824 (1987). *See also Coulter*, 169 W. Va. at 530, 288 S.E.2d at 821 (1982) ("In order to take advantage of remarks made during an opening statement or closing argument which are considered improper an objection must be made and counsel must request the court to instruct the jury to disregard them."). The Court has long held that the "[f]ailure to make timely and proper objection to remarks of counsel made in the presence of the jury, during the trial of a case, constitutes a waiver of the right to raise the question thereafter either in the trial court or in the appellate court." Syl. pt. 6, *Yuncke v. Welker*, 128 W. Va. 299, 36 S.E.2d 410 (1945). The Court reasoned in *Yuncke* that an objection to prejudicial comments must be made contemporaneously with the comments so that the trial court has an opportunity to take corrective action. *Id.* at 311, 36 S.E.2d at 416.

17

The record shows that defense counsel did not make an objection—neither during nor after the State's rebuttal—to the comment made by the prosecutor. Therefore, we find that pursuant to the above-cited precedent, Mr. Rollins waived the right to challenge the State's rebuttal argument on appeal. *See also State v. Young*, 185 W. Va. 327, 349 n.25, 406 S.E.2d 758, 780 n.25 (1991) (refusing to address alleged improper remarks made during closing arguments by the prosecutor, finding that the petitioner had waived the issue by failing to raise it at trial).

Additionally, in making accusations against the prosecutor in its closing argument, the defense invited the prosecutor's comment.

> "Invited error" is a cardinal rule of appellate review applied to a wide range of conduct. It is a branch of the doctrine of waiver which prevents a party from inducing an inappropriate or erroneous response and then later seeking to profit from that error. The idea of invited error is not to make the evidence admissible but to protect principles underlying notions of judicial economy and integrity by allocating appropriate responsibility for the inducement of error. Having induced an error, a party in a normal case may not at a later stage of the trial use the error to set aside its immediate and adverse consequences.

*State v. Crabtree*, 198 W. Va. 620, 627, 482 S.E.2d 605, 612 (1996). We have held, ""'An appellant or plaintiff in error will not be permitted to complain of error in the admission of evidence which he offered or elicited, and this is true even of a defendant in a criminal case." Syl. Pt. 2, *State v. Bowman,* 155 W.Va. 562, 184 S.E.2d 314 (1971).' Syl. Pt. 1, *State v. Compton,* 167 W.Va. 16, 277 S.E.2d 724 (1981)." Syl. pt. 3, *id.*

18

In his reply brief to this Court, Mr. Rollins submits that the plain error doctrine should apply to the prosecutor's remark. *See* syl. pt. 7, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995) ("To trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings.") Insofar as we have determined that the prosecutor's remarks were in direct response to closing arguments made by the petitioner, we find the plain error doctrine is simply not applicable.[5] We conclude that the circuit court committed no error with regard to the prosecutor's comment.

## B. Juror bias

Mr. Rollins presents two assignments of error with regard to juror bias. In the first of those two assignments of error, Mr. Rollins alleges that the circuit court committed reversible error by failing to strike one juror, Juror Jordan, for cause during voir dire. Mr. Rollins contends that Juror Jordan expressed bias justifying her removal from the jury panel by the circuit court. Although the circuit court refused to strike Juror

---

[5] In *Crabtree*, we recognized that "[d]eviation from the doctrine of invited error is permissible when application of the rule would result in a manifest injustice." 198 W. Va. at 628, 482 S.E.2d at 613. "[W]hether the circumstances of a particular case justify deviation from the normal rule is left largely to the discretion of the appellate court." *Id.* Here, we see no reason to apply that exception, particularly in light of the fact that the weight of the evidence against Mr. Rollins is heavy. *See infra* Part III.C.

19

Jordan for cause, she did not sit on the jury; Mr. Rollins used a peremptory strike to remove her from the panel.

The Court reviews challenges to jurors under the following standard of review:

> "In reviewing the qualifications of a jury to serve in a criminal case, we follow a three-step process. Our review is plenary as to legal questions such as the statutory qualifications for jurors; clearly erroneous as to whether the facts support the grounds relied upon for disqualification; and an abuse of discretion as to the reasonableness of the procedure employed and the ruling on disqualification by the trial court." *State v. Miller*, 197 W.Va. 588, 600–01, 476 S.E.2d 535, 547–48 (1996).

*State v. Sutherland*, 231 W. Va. 410, 412, 745 S.E.2d 448, 450 (2013).

In *Sutherland*, we held:

> A trial court's failure to remove a biased juror from a jury panel, as required by W. Va.Code § 62-3-3 (1949) (Repl.Vol.2010), does not violate a criminal defendant's right to a trial by an impartial jury if the defendant removes the juror with a peremptory strike. In order to obtain a new trial for having used a peremptory strike to remove a biased juror from a jury panel, a criminal defendant must show prejudice. The holding in Syllabus point 8 of *State v. Phillips*, 194 W.Va. 569, 461 S.E.2d 75 (1995), is expressly overruled.

Syl. pt. 3, *Id.* *Sutherland* makes clear that unless a criminal defendant shows prejudice, a trial court does not commit reversible error when it fails to strike a juror for cause where a party uses a peremptory strike to eliminate the offending juror from the jury panel.

20

We note that *Sutherland* does not provide an explicit guideline as to how a reversal could occur when a defendant has removed a biased juror with a peremptory strike. However, many of the cases cited and followed in *Sutherland* set out the test that must be satisfied when a defendant has removed a biased juror. The test has been stated in different ways, but essentially, "a challenge must show that the appellant was forced to accept a juror who should have been excused for cause." *Miles v. State*, 85 S.W.3d 907, 911 (Ark. 2002). That is, appellate courts "will not find reversible error based on the trial court's refusal to remove that juror for cause unless the resulting jury was not fair and impartial." *State v. Kuhs*, 224 P.3d 192, 198 (Ariz. 2010). *See Minch v. State*, 934 P.2d 764, 770 (Alaska Ct. App. 1997) ("[Defendant] must also demonstrate some reason to believe that one or more of the jurors who decided his case were, in fact, not fair.").

Mr. Rollins argues that the Court should presume prejudice where a criminal defendant is forced to use a peremptory challenge to remove a prospective juror and a biased juror is nonetheless seated on the jury panel that convicts him. The defendant relies on his second assignment of error with regard to juror bias as the basis for reversal pursuant to *Sutherland*. Therefore, we will proceed by addressing Mr. Rollins's second assignment of error with regard to this issue.

In his second challenge regarding juror bias, Mr. Rollins insists that the circuit court erred by allowing another juror, Juror Crislip, to remain on the jury despite the discovery, after jury selection was complete and directly prior to opening statements, that Juror Crislip was a former client of the prosecutor. The defense objected, requesting that the circuit court strike Juror Crislip. The court denied the request; however, prior to closing arguments, the court gave the petitioner the option of replacing Juror Crislip with the alternate juror, Juror Montgomery:

> THE COURT: You had previously filed a motion to remove [Juror] Crislip. Do you want to renew that motion since we have an alternate [Juror Montgomery] or --
> MR. VANBIBBER: No, sir.
> THE COURT: Ok. You just want Mr. Crislip to stay?
> MR. VANBIBBER: Well, your Honor, I don't want to waive my original objection to him, but I would choose him over the alternate.
> THE COURT: Okay.
> . . . .
> THE COURT: Okay, and so I -- I just -- There was a motion to strike him, and I was going to let you bring it up again if you want to, but if you don't want to, that's fine, too.

Through this exchange, it is clear that the defense preferred Juror Crislip to Juror Montgomery. The defense reasoned before the circuit court that Juror Montgomery was biased because children of the prosecutor and Juror Montgomery had played sports together.

22

Rule 24(c) of the West Virginia Rules of Criminal Procedure describes the selection and operation of alternate jurors:

> The court may direct that more jurors in addition to the regular jury be called and impaneled to sit as alternate jurors. Alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties. Alternate jurors shall be drawn in the same manner, shall have the same qualifications, shall be subject to the same examination and challenges, shall take the same oath, and shall have the same functions, powers, facilities and privileges as the regular jurors. An alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict. Each side is entitled to one peremptory challenge in addition to those otherwise allowed by law if one or two alternate jurors are to be impaneled, two peremptory challenges if three or four alternate jurors are to be impaneled, and three peremptory challenges if five or six alternate jurors are to be impaneled. The additional peremptory challenges may be used against an alternate juror only, and the other peremptory challenges allowed by these rules may not be used against an alternate juror.

Rule 24(c) commands that if a regular juror is not qualified to sit on the jury, that juror should be replaced with an alternate juror prior to the jury retiring to consider a verdict. Under this rule, if Juror Crislip had been struck from the jury, he would have been replaced by the one alternate juror, Juror Montgomery.

The defense argued below that Juror Montgomery was biased, yet at no point during voir dire did the defense voice any objection to Juror Montgomery. The defense did not request that Juror Montgomery be struck for cause, nor does Mr. Rollins

23

now claim that he was denied a peremptory strike to remove her from the jury. By failing to make any objections to Juror Montgomery during voir dire, this Court can only conclude that the defense deemed her fit to serve as an alternate juror. In the absence of any new information of bias uncovered after voir dire, any objection to Juror Montgomery is waived.

Had Juror Crislip been struck from the jury because of his prior relationship with the prosecutor, he would have been replaced by Juror Montgomery—a juror chosen by the parties—pursuant to Rule 24(c). When asked prior to closing arguments if the defense wished to renew its objection to Juror Crislip and replace him with Juror Montgomery, the defense answered in the negative.[6] Therefore, we find that Mr. Rollins waived his objection to Juror Crislip. Further, because the defense chose to permit Juror Crislip to remain on the jury, he cannot now claim that he received a biased jury pursuant to *Sutherland* because Juror Crislip sat on the jury.

### C. Evidence of domestic violence

Under this assignment of error, Mr. Rollins takes issue with five alleged acts of domestic violence introduced through the testimony of Jimmy Thompson, a friend

---

[6] We note that when the defense first objected to Juror Crislip upon the discovery of his relationship with the prosecutor, the defense did not voice any objections to replacing him with alternate juror, Juror Montgomery.

and neighbor of Ms. Rollins. Mr. Thompson stated that he witnessed Mr. Rollins shake his wife in Spring 2009 and that he saw Mr. Rollins swat her head in May 2009. Mr. Thompson also took photographs of bruising on Ms. Rollins's body on three occasions: the first was taken in July 2009 and showed a bruise on Ms. Rollins's chest, the second was also taken in July 2009 and showed a bruise on her nose, and the third was taken in August 2009 and showed a bruise on her thigh. Those photographs were introduced at trial, and Mr. Thompson testified that Mrs. Rollins told him that her husband had inflicted the bruises upon her. An *in camera* pretrial hearing was held to examine the evidence. The circuit court concluded that all such evidence was admissible at trial.

Mr. Rollins contends that the circuit court erred by admitting the State's "bad character" evidence—the domestic violence evidence—as proof of absence of mistake or accident pursuant to Rule 404(b) of the West Virginia Rules of Evidence, which states, in part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

Mr. Rollins also argues that the circuit court erred in finding by a preponderance of the evidence that Mr. Rollins caused the bruises in Mr. Thompson's photographs. Finally, Mr. Rollins argues that all five acts of domestic violence should have been excluded pursuant to Rule 403 of the West Virginia Rules of Evidence. Rule 403 states that

"[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

The Court held in syllabus point 2 of *State v. McGinnis*, 193 W. Va. 147, 455 S.E.2d 516 (1994), that when there is an offer of 404(b) evidence, the trial court must hold an *in camera* hearing to evaluate that evidence:

> Where an offer of evidence is made under Rule 404(b) of the West Virginia Rules of Evidence, the trial court, pursuant to Rule 104(a) of the West Virginia Rules of Evidence, is to determine its admissibility. Before admitting the evidence, the trial court should conduct an *in camera* hearing as stated in *State v. Dolin*, 176 W.Va. 688, 347 S.E.2d 208 (1986). After hearing the evidence and arguments of counsel, the trial court must be satisfied by a preponderance of the evidence that the acts or conduct occurred and that the defendant committed the acts. If the trial court does not find by a preponderance of the evidence that the acts or conduct was committed or that the defendant was the actor, the evidence should be excluded under Rule 404(b). If a sufficient showing has been made, the trial court must then determine the relevancy of the evidence under Rules 401 and 402 of the West Virginia Rules of Evidence and conduct the balancing required under Rule 403 of the West Virginia Rules of Evidence. If the trial court is then satisfied that the Rule 404(b) evidence is admissible, it should instruct the jury on the limited purpose for which such evidence has been admitted. A limiting instruction should be given at the time the evidence is offered, and we recommend that it be repeated in the trial court's general charge to the jury at the conclusion of the evidence.

26

This Court reviews a circuit court's decision regarding the admissibility of Rule 404(b) evidence according to *State v. LaRock*, 196 W. Va. 294, 310–11, 470 S.E.2d 613, 629–30 (1996):

> The standard of review for a trial court's admission of evidence pursuant to Rule 404(b) involves a three-step analysis. First, we review for clear error the trial court's factual determination that there is sufficient evidence to show the other acts occurred. Second, we review *de novo* whether the trial court correctly found the evidence was admissible for a legitimate purpose. Third, we review for an abuse of discretion the trial court's conclusion that the "other acts" evidence is more probative than prejudicial under Rule 403.

If a trial court has admitted "bad character" evidence in error, a petitioner is only entitled to reversal if the error affected his substantial rights. W. Va. R. Crim. P. 52 ("Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded."); W. Va. R. Evid. 103(a) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . [i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context."). An error affects a petitioner's substantial rights if "the error was prejudicial. It must have affected the outcome of the proceedings in the circuit court, and the defendant rather than the prosecutor bears the burden of persuasion with respect to prejudice." Syl. pt. 9, in part, *Miller*, 194 W. Va. 3, 459 S.E.2d 114.

Finally, we held, in syllabus point 10 of *State v. Derr*, 192 W. Va. 165, 451 S.E.2d 731 (1994) (in part), that "[a]s to the balancing under Rule 403, the trial court enjoys broad discretion. The Rule 403 balancing test is essentially a matter of trial conduct, and the trial court's discretion will not be overturned absent a showing of clear abuse."

We proceed with our analysis by examining the admissibility of the evidence pursuant to the requirements for admissibility set forth in *McGinnis*.

### 1. The purpose of the evidence

Pursuant to *McGinnis*, for the evidence of prior bad acts to be admissible, the acts must fall under an exception to Rule 404(b), and the court must make a determination as to the purpose for which the evidence is to be admitted. Upon our examination of the evidence in question, we find that such evidence was properly admitted as proof of an absence of accident or mistake. Mr. Rollins asserted at trial that his wife's death was an accident, and the domestic violence evidence was presented to rebut that position. In *State v. Mongold*, 220 W. Va. 259, 265, 647 S.E.2d 539, 545 (2007), the Court allowed evidence of prior abuse of another child to rebut the petitioner's argument that his young daughter's death was an accident:

> In an effort to rebut Mr. Mongold's evidence regarding his theories of how [his young daughter] Hannah's injuries could have occurred accidently, the State sought to introduce evidence of an incident involving a five-year-old child . . . [in

28

which he] "held the child up against the wall by the throat, causing the child to bleed and become unconscious . . . ."

The trial court in *Mongold* determined that the evidence was admissible to prove absence of accident or mistake:

> The trial court concluded that the evidence was relevant "to show that this was not an accident and that it was intentional," as argued by the State. *See United States v. Sanders*, 343 F.3d 511, 518 (5th Cir.2003) ("[I]t has been established that the government offered the evidence to prove intent and refute [the defendant's] claim of mistake or accident. These purposes are permissible under [Rule] 404(b)."). It was also found by the trial court "that the probative value [of the evidence] would, in fact, outweigh the prejudicial effect[.]"

*Id.* at 265–66, 647 S.E.2d at 545–46 (alterations in original).

Mr. Rollins attempts on appeal to distinguish his case from *Mongold* by pointing to the fact that the petitioner in *Mongold* presented witnesses who testified to the petitioner's good character and that the petitioner's testimony suggested that his daughter's injuries were accidently caused while playing a game of "airplane"[7] with her. Essentially, he contends that, pursuant to *Mongold*, evidence of prior bad acts to prove absence of accident or mistake is only permissible where the petitioner has presented

---

[7] "This game required Mr. Mongold to lie on his back and place one of the children on his raised legs and, while holding the child's hands, twirl the child in the air." *Mongold*, 220 W. Va. at 263, 647 S.E.2d at 543.

evidence of his good character and/or where the petitioner was involved in and contributed to the accident.

We find neither argument persuasive. Although the Court recognized in *Mongold* that witnesses testified at trial regarding the petitioner's good character, the Court's decision to admit the evidence of prior abuse did not hinge on the existence of that testimony. Instead, the Court focused on the admissibility exceptions in Rule 404(b).

Furthermore, we disagree that *Mongold* requires that a defendant admit to being involved in or that he actively contributed to the incident in question for the evidence of absence of accident or mistake to be admissible. In support of his argument, Mr. Rollins omits relevant facts in *Mongold*. In addition to theorizing that his daughter's severe head trauma occurred while playing "airplane," an act in which the petitioner admits to having an active role, the petitioner also speculated that his daughter's injuries may have resulted from being knocked down by the family dog or falling off of the family's deck. The latter two events did not involve the active participation of the petitioner. Because the evidence of prior abuse was permitted to rebut all three scenarios, it is clear that *Mongold* does not make a defendant's active contribution to a victim's injuries a prerequisite for the introduction of Rule 404(b) evidence to prove absence of mistake or accident. We conclude that the circuit court correctly determined that the

30

evidence of prior abuse presented by Jimmy Thompson was admissible to prove absence of accident or mistake.

### 2. Preponderance of the evidence standard

Having found that the domestic violence evidence was properly admitted to show absence of accident or mistake, *McGinnis* requires that we proceed to determining whether the events giving rise to the evidence occurred by a preponderance of the evidence. Mr. Rollins submits that the photographed bruises and the testimony describing the source of the bruises in the photographs were improperly admitted pursuant to *McGinnis*. He asks this Court to find that the circuit court abused its discretion in finding by a preponderance of the evidence that the acts of domestic violence culminating in bruising on his wife and the subsequent photographs actually occurred. Mr. Rollins concedes that the circuit court did not err in finding by a preponderance of the evidence that the two acts of violence Mr. Thompson personally witnessed—Mr. Rollins shaking and swatting his wife—occurred. Therefore, we proceed by evaluating this particular factor of *McGinnis*—the preponderance of the evidence standard—only with regard to the photographs and their accompanying testimony.

Mr. Rollins asserts that the only evidence explaining how the bruising occurred was the alleged statements of his now deceased wife as presented through the testimony of Mr. Thompson. Mr. Rollins argues that the statements are not reliable

31

enough to support a finding by a preponderance of the evidence that Mr. Rollins caused the bruising through acts of domestic violence. In conjunction with this argument, Mr. Rollins also argues that Mr. Thompson's testimony as to the specifics of his discussions with Ms. Rollins were inadmissible hearsay and that the photographs, which relied on those hearsay statements, were not relevant. We disagree.

Hearsay is defined in Rule 801(c) of the West Virginia Rules of Evidence: "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

The circuit court found that the statements Ms. Rollins allegedly made to Mr. Thompson were not hearsay because they were admitted "solely for the purpose of identifying the bruises seen in the photographs." This Court has held that when out-of-court statements are admitted solely for identification purposes they are admissible. Syl. pt. 1, *State v. Maynard*, 183 W. Va. 1, 393 S.E.2d 221 (1990) ("Generally, out-of-court statements made by someone other than the declarant while testifying are not admissible unless: 1) the statement is not being offered for the truth of the matter asserted, but for some other purpose such as motive, intent, state-of-mind, identification or reasonableness of the party's action; 2) the statement is not hearsay under the rules; or 3) the statement is hearsay but falls within an exception provided for in the rules."). "Third-party testimony regarding an out-of-court identification may in certain circumstances be admissible when

32

the identifying witness testifies at trial because both the identifying witness and the third party are then available for cross-examination." Syl. pt. 6, *State v. Carter*, 168 W. Va. 90, 282 S.E.2d 277 (1981). *Accord State v. Spence*, 182 W. Va. 472, 388 S.E.2d 498 (1989); *State v. Boyd*, 167 W. Va. 385, 280 S.E.2d 669 (1981). With regard to third party testimony regarding the out-of-court testimony of an identifying witness, "[t]he underlying rationale of the hearsay rule is to prevent the admission into evidence of unreliable or untrustworthy evidence. The major vehicle through which trustworthiness of evidence is guaranteed is cross-examination." *Boyd*, 167 W. Va. at 397, 280 S.E.2d at 681. *See also* syl. pt. 2, *State v. Phillips*, 194 W. Va. 569, 461 S.E.2d 75 (1995), *overruled on other grounds by State v. Sutherland*, 231 W. Va. 410, 745 S.E.2d 448 (2013) ("'The mission of the Confrontation Clause found in the Sixth Amendment to the United States Constitution and Section 14 of Article III of the West Virginia Constitution is to advance a practical concern for the accuracy of the truth-determining process in criminal trials, and the touchstone is whether there has been a satisfactory basis for evaluating the truth of the prior statement. An essential purpose of the Confrontation Clause is to ensure an opportunity for cross-examination. In exercising this right, an accused may cross-examine a witness to reveal possible biases, prejudices, or motives.' Syllabus Point 1, *State v. Mason*, 194 W.Va. 221, 460 S.E.2d 36 (1995).").

First, we note that in examining our authority regarding the hearsay exception for identification purposes, we find that previous identifications have dealt with

a witness's identification of the defendant personally, such as at the scene of a crime. *See Carter*, 168 W. Va. 90, 282 S.E.2d 277; *Spence*, 182 W. Va. 472, 388 S.E.2d 498; *Boyd*, 167 W. Va. 385, 280 S.E.2d 669 (1981). Second, even if the testimony at issue in the case at bar is identification evidence within the meaning of *Maynard*, it was improperly admitted as identification evidence because the witness, Ms. Rollins, could not testify at trial and was not subject to cross-examination. Thus, Ms. Rollins's statements to Mr. Thompson regarding her bruises were, as Mr. Rollins asserts, hearsay.

In an extensive order entered July 5, 2012, the circuit court concluded that even if the statements were hearsay, they were subject to the hearsay exceptions set forth in Rule 803(1) of the West Virginia Rules of Evidence and Rule 804(b)(5) of the West Virginia Rules of Evidence.

Rule 803(1) states that a "present sense impression"—"A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter"—is not excluded by the hearsay rule. This Court expounded on that rule in syllabus point 4 of *Phillips*, 194 W. Va. 569, 461 S.E.2d 75:

> It is within a trial court's discretion to admit an out-of-court statement under Rule 803(1), the present sense impression exception, of the West Virginia Rules of Evidence if: (1) The statement was made at the time or shortly after an event; (2) the statement describes the event; and (3) the event

34

giving rise to the statement was within a declarant's personal knowledge.

The Court explained the history and purpose of the present sense impression exception:

> The present sense impression exception is an outgrowth of the common law *res gestae* (a Latin phrase meaning "things done") exception and a cousin to the excited utterance exception embodied in Rule 803(2) of the Rules of Evidence. *See* T.P. Hardman, *Spontaneous Exclamations v. Res Gestae*, 25 W. Va. L.Q. 341 (1918). The *res gestae* exception was an umbrella exception that permitted trial courts to admit assorted spontaneous extrajudicial statements if there was contemporaneity between the act established and the declarations, "precluding the reflection that gives rise to falsehood." *Reynolds v. W.T. Grant Co.*, 117 W.Va. 615, 620, 186 S.E. 603, 605 (1936); *State v. Coram*, 116 W.Va. 492, 182 S.E. 83 (1935); *Thompson v. Updegraff*, 3 W.Va. 629 (1869); *Beckwith v. Mollohan*, 2 W.Va. 477 (1868).

*Phillips*, 194 W. Va. at 576, 461 S.E.2d at 82.

The circuit court justified the admission of Ms. Rollins's allegations of abuse under Rule 803(1) as follows: "Teresa Rollins made the challenged statements shortly after the occurrence of the incidents of domestic violence, as evidenced by the bruises visible on her body, when she was explaining her statements. As such, the proximity in time is sufficient to reduce the hearsay dangers of faulty memory or insincerity."

With regard to its finding that the domestic violence statements were subject to the hearsay exception set forth in Rule 803(1), we do not believe that such

statements by Ms. Rollins constitute present sense impressions. No testimony was presented at the *in camera* hearing indicating that Ms. Rollins's assertions of domestic violence were made contemporaneously with the bruising so as to "preclude the reflection that gives rise to falsehood." Mr. Rollins aptly points out in his brief that bruises may be visible for days or weeks, and in no way did the existence of bruises on Ms. Rollins's body—without accompanying testimony as to when they were inflicted—indicate that she received those bruises within the timeframe contemplated in Rule 803(1).

However, the circuit court also relied on the hearsay exception set forth in Rule 804(b)(5), in its determination that the statements by Ms. Rollins were admissible:

> **(b) Hearsay Exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> . . . .
>
> (5) *Other Exceptions.* A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will be best served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party, sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

36

The circuit court reasoned:

> It is undisputed that Teresa Rollins is unavailable. . . .
> The [c]ourt finds that the statements are trustworthy as they
> are documented by the photographs and the similar testimony
> of two, unrelated witnesses [Mr. Thompson and Regina
> Lucente].[8] Additionally, the statements are being "offered as
> evidence of a material fact", namely for identification of the
> source of the bruises shown in the photographs. As the only
> evidence that could identify the bruises shown in the
> photographs, the statements are certainly "probative on the
> point for which" they are offered. Finally, the interests of
> justice will be best served by admission of the statements into
> evidence.

(Footnote added).

> With regard to the hearsay exception in Rule 804(b)(5), we have held:

> Under the requirements of the Confrontation Clause
> contained in the Sixth Amendment to the United States
> Constitution, evidence offered under the residual hearsay
> exceptions contained in Rule 803(24) and Rule 804(b)(5) of
> the West Virginia Rules of Evidence is presumptively
> unreliable because it does not fall within any firmly rooted
> hearsay exception, and, therefore, such evidence is not
> admissible. If, however, the State can make a specific
> showing of particularized guarantees of trustworthiness, the
> statements may be admissible. In this regard, corroborating
> evidence may not be considered, and it must be found that the
> declarant's truthfulness is so clear that cross-examination
> would be of marginal utility.

---

[8] In its order, the circuit court stated that, "although not admissible at trial, Regina
Lucente[] test[ified] that she had witnessed domestic violence between the Defendant and
Teresa in the past."

Syl. pt. 6, *State v. James Edward S.*, 184 W. Va. 408, 400 S.E.2d 843 (1990), *overruled on other grounds by State v. Mechling*, 219 W. Va. 366, 633 S.E.2d 311 (2006).[9] In *James Edward S.*, the Court referred to the United States Supreme Court's decision in *Idaho v. Wright*, 497 U.S. 805 (1990), to explain the meaning of "particularized guarantee of trustworthiness":

> As to what constitutes a particularized guarantee of trustworthiness, the [U.S. Supreme] Court stated that this proof must come from the "totality of the circumstances," but

---

[9] The Court overruled *James Edward S.* to comport with the United States Supreme Court's demands regarding testimonial hearsay:

> To the extent that *State v. James Edward S.*, 184 W.Va. 408, 400 S.E.2d 843 (1990), *State v. Mason*, 194 W.Va. 221, 460 S.E.2d 36 (1995), and *State v. Kennedy*, 205 W.Va. 224, 517 S.E.2d 457 (1999), rely upon *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (*overruled by Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)) and permit the admission of a testimonial statement by a witness who does not appear at trial, regardless of the witness's unavailability for trial and regardless of whether the accused had a prior opportunity to cross-examine the witness, those cases are overruled.

Syl. pt. 7, *Mechling*, 219 W. Va. 366, 633 S.E.2d 311.

Despite Mr. Rollins's position to the contrary, the statements in question are not testimonial. The Court does "not perceive that *Crawford's* largely unexplored ban on 'testimonial hearsay' that has not been tested by cross-examination extends to the statements to non-official and non-investigatorial witnesses, made prior to and apart from any governmental investigation." *State v. Ferguson*, 216 W. Va. 420, 423, 607 S.E.2d 526, 529 (2004). The statements in this case were made to Mr. Thompson, a non-official and non-investigatorial witness, and the statements were not made in conjunction with a governmental investigation.

38

these circumstances "include only those that surround the making of the statement and that render the declarant particularly worthy of belief." . . . It went on to point out that the trustworthiness of the out-of-court statement must be so apparent from the relevant circumstances that "cross-examination would be of marginal utility." . . . If these very stringent conditions are met, then the statement has sufficient indicia of reliability to be admitted.

*James Edward S.*, 184 W. Va. at 414–15, 400 S.E.2d at 849–50 (internal citations to *Wright* omitted).

Upon careful review of the circuit court's analysis, we find that although the circuit court was incorrect in its reliance upon Rule 803(1) ("present sense impression"), the circuit court nevertheless correctly determined that the evidence at issue falls under the hearsay exception in Rule 804(b)(5). Furthermore, because the circuit court established the trustworthiness of the statements, we find that the abuse alleged by Ms. Rollins through the testimony of Mr. Thompson occurred by a preponderance of the evidence.

### 3. Rule 401 and Rule 402

Mr. Rollins contends that all five of the domestic violence incidents to which Mr. Thompson testified—those acts personally witnessed by him, the photographs of the bruises on Ms. Rollins's body, and the alleged statements of Ms. Rollins given through Mr. Thompson—were too remote in time to the alleged murder to be admissible pursuant to Rules 401 and 402 of the West Virginia Rules of Evidence and *State v. Gray*,

39

217 W. Va. 591, 619 S.E.2d 104 (2005). Mr. Rollins asserts that the circuit court did not properly balance the evidence at issue under Rule 401 and Rule 402.

Rule 401, defines "relevant evidence." *See supra* Part III.C.2. Rule 402 discusses the admissibility of relevant evidence: "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by the Constitution of the State of West Virginia, by these rules, or by other rules adopted by the Supreme Court of Appeals. Evidence which is not relevant is not admissible."

The language of Rules 401 and 402 is clear: There is no requirement in those rules that evidence must be closely connected in time to an event at issue to be relevant. Upon our examination of *Gray*, we find that it is wholly irrelevant to interpreting the meaning of Rules 401 and 402. Nowhere in the case does the Court mention Rules 401 or 402. Further, the Court's discussion of remoteness in that case was in the context of determining whether a Rule 404(b) prior bad act was part of the *res gestae* of the crime charged, not whether the evidence was relevant. *Gray*, 217 W. Va. at 600, 619 S.E.2d at 113.

With regard to Rules 401 and 402, the circuit court did not abuse its discretion admitting the domestic violence evidence.

## 4. Rule 403

Mr. Rollins argues that even if any of the domestic violence evidence is relevant and otherwise admissible, it should be excluded pursuant to Rule 403 as being more prejudicial than probative. As we recognized above, trial courts are afforded discretion in deciding questions of admissibility. In its July 5, 2012, order memorializing its findings and conclusions in the *in camera McGinnis* hearing, the circuit court said:

> Specifically, the Defendant contends that Teresa Rollins' death was an accident resulting from a falling tree and that she was alone at the time of the accident. The State disputes the Defendant's scenario and believes that the Defendant caused Teresa Rollins' death. As such, the State contends that the domestic violence endured by Teresa Rollins in 2009 is relevant to show that her death was not an accident. Specifically, the State contends that the domestic violence Teresa Rollins endured in 2009 was an ongoing theme in her marriage and is highly relevant to prove her murder was perpetuated without mistake or accident.

The circuit court noted that while there is no standard set of factors that must be considered when conducting the balancing test set forth in Rule 403, the Court has recognized certain factors that are relevant:

> Although there is no universal agreement among jurists regarding the factors to be considered by a trial court in conducting its balancing under Rule 403, there is some consensus that the following factors are at least relevant: (a) the need for the evidence, (b) the reliability and probative force of the evidence, (c) the likelihood that the evidence will be misused because of its inflammatory effect, (d) the effectiveness of limiting instructions, (e) the availability of other forms of proof, (f) the extent to which admission of evidence will require trial within trial, and (g) the remoteness and similarity of the proffered evidence to the charged crime.

41

*McGinnis*, 193 W. Va. at 156 n.11, 455 S.E.2d at 525 n.11. The circuit court carefully examined each factor set forth in *McGinnis*:

> In the present case, (a) the State argues that the probative value of the prior incidents of domestic violence is extremely important for the trier of fact to see the continuous domestic violence that demonstrates the "absence of mistake or accident" regarding the murder of Teresa Rollins. Second, (b) as the evidence will be presented through an eye witness, photographs and testimony, the Court finds that it is reliable and highly probative of the relationship between the Defendant and Teresa Rollins. The Court does acknowledge that (c) the evidence of prior abuse may be inflammatory, but finds that it is not being used for any improper purpose. Additionally, the court will give the required limiting instruction, and (d) believes that such instruction will be effective in guiding the jury to only consider the evidence for purposes of showing that Teresa Rollins' death was not an accident.
>
> With respect to other forms of proof, (e) it appears that there is other evidence to show that Teresa Rollins' death was not accidental, but the evidence of prior abuse is the best proof of the nature of the relationship between the Defendant and Teresa Rollins. Based on the *in camera* hearing held by this Court regarding the evidence of prior abuse, (f) the admission of the evidence will not require a trial within a trial, but will only require testimony from . . . Jimmy Thompson . . . plus admission of the photographs. Finally, (g) the proffered evidence bears similarities to the crime charged. . . . This evidence demonstrates the Defendant's complete disregard for Teresa Rollins and lack of spousal affection.

(Footnotes omitted). The circuit court concluded that "the evidence of prior abuse to Teresa Rollins is admissible and may be used to show the absence of accident with respect to Teresa Rollins' death."

42

In his brief, Mr. Rollins details his reasons for finding error in the circuit court's analysis:

> As to (a), the need for the evidence was low, as the State had secured the testimony of April Bailes who testified at trial that the Appellant admitted to her that he had killed his wife. As to (b), the reliability of at least three of the five alleged incidents was low as it was based on inadmissible hearsay. Regarding (c), the trial court even acknowledged that the evidence of prior abuse may be inflammatory. Additionally, as to (d), the standard limiting instruction given by the Court cannot be considered to be effective, due to the inflammatory nature of the evidence. As to (e), the trial court concluded that there was other evidence to show that Teresa Rollins' death was not accidental but the evidence of prior abuse was the best proof. Again, this is even though April Bailes testified that the Appellant admitted to her that he had killed his wife. As to (f), admission of this evidence certainly required a trial within a trial, as multiple witnesses were called to attack [Mr.] Thompson's character for truthfulness. Lastly, as to (g), the alleged acts of prior abuse introduced by the State in this case range from 3-6 months old and are unrelated to the alleged murder. As such, they were remote in time and should have been excluded. To the extent that the trial court concluded otherwise, it abused its discretion.

(Citations to the appendix record omitted).

Upon our examination of the circuit court's reasoning and the arguments of Mr. Rollins, we find that the circuit court did not abuse its discretion in finding that the domestic violence evidence was more probative than prejudicial pursuant to Rule 403.

### 5. The evidence was properly admitted

Because we did not discern any error on the part of the circuit court in the foregoing discussion with regard to the evidence of domestic violence pursuant to *McGinnis*, we find that the evidence was properly admitted at trial. Even had we found any error with regard to this evidence, the outcome of this case would not have been affected by the inclusion of the evidence because of the unchallenged evidence presented against Mr. Rollins at trial: (1) Ms. Bailes's testimony that Mr. Rollins admitted to killing his wife, (2) Mr. Rollins's recorded statement to police, (3) evidence of the increased life insurance policies, and (4) the testimony of the State's medical expert witnesses who each claimed that Ms. Rollins's injuries were not consistent with a tree falling on her. Had the State never presented the domestic violence evidence, we do not believe that the jury's verdict would have been different.

### D. Cumulative evidence

Mr. Rollins argues that the circuit court erred by allowing the State to present the testimony of a third medical expert witness: Dr. Wecht.[10] Mr. Rollins submits that because he had the financial means to present only one medical expert witness to testify on his behalf, the State's third expert opinion constituted cumulative evidence that prejudiced him.

---

[10] Although Mr. Rollins objected below to the circuit court's decision to allow more than one of the expert witnesses to testify, on appeal his only objection is to the circuit court's decision to allow the testimony of Dr. Wecht.

Dr. Sabet performed the first autopsy on Ms. Rollins. At trial, Dr. Sabet testified during the State's case-in-chief that after speaking with representatives of the State Police, he believed that Ms. Rollins's injuries were not consistent with being struck by a falling tree. Dr. Sabet was cross-examined regarding his opinion. Dr. Kaplan also testified, explaining that he also did not believe that Ms. Rollins's injuries were consistent with being struck by a falling tree. Dr. Kaplan had not participated in the first autopsy, but he reviewed Dr. Sabet's autopsy findings. Dr. Kaplan was also cross-examined regarding his opinion.

Additionally, the State presented the testimony of medical expert witness, Dr. Wecht. Dr. Wecht performed a second autopsy on Ms. Rollins, producing a report of his findings on May 5, 2012. Dr. Wecht discussed the injuries he viewed on Ms. Rollins's body during the autopsy. Like Dr. Sabet and Dr. Kaplan, Dr. Wecht also concluded that the injuries were not consistent with being struck by a falling tree.

Mr. Rollins objected at trial prior to Dr. Wecht taking the stand, arguing that Dr. Wecht's testimony would be cumulative. He did not object to the State presenting evidence of additional injuries found by Dr. Wecht, but he did object to a third medical expert witness rendering an opinion that Ms. Rollins's injuries were not

45

consistent with being struck by a falling tree. The circuit court overruled the objection, stating:

> Well, the issue -- the issue in this case is -- of course, is the manner and cause of death, and from the beginning, the forensic pathology reports have been attacked, and the -- and I -- This is the State's response and, I guess, in -- to those attacks; so even though it may be somewhat cumulative, I think it is probative of the issues in this case so I'll deny the motion to -- to limit his testimony.

Rule 403 allows for a trial court to exclude relevant evidence that is more prejudicial than probative because the evidence constitutes a "needless presentation of cumulative evidence." In reviewing a trial court's decision to admit or exclude evidence pursuant to Rule 403, we apply an abuse of discretion standard:

> "The action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion." Syllabus point 10, *State v. Huffman*, 141 W.Va. 55, 87 S.E.2d 541 (1955), *overruled on other grounds by State ex rel. R.L. v. Bedell*, 192 W.Va. 435, 452 S.E.2d 893 (1994).

Syl. pt. 2, *State v. Doonan*, 220 W. Va. 8, 640 S.E.2d 71 (2006).

Having reviewed this assignment of error, we conclude that the circuit court did not abuse its discretion by admitting Dr. Wecht's testimony. First, Dr. Wecht performed a second autopsy on Ms. Rollins and made findings during the autopsy that were different from the findings of Dr. Sabet; Dr. Wecht's examined the spinal column

46

and spinal cord and made findings on those that Dr. Sabet did not make. Thus, Dr. Wecht's testimony was not entirely cumulative. Second, Mr. Rollins's defense was premised on the argument that the former governor's influence pressured Dr. Sabet and Dr. Kaplan to change their conclusions from "drowning complicated compression asphyxia" to "asphyxia due to probable strangulation." Dr. Wecht was *not* subject to the influence of the former governor. In that respect, his testimony that Ms. Rollins's injuries were not consistent with being struck by a falling tree was necessary to show a justification for the change in opinion of Dr. Sabet and Dr. Kaplan apart from pressure from the former governor.

## E. Unfair surprise

Mr. Rollins asserts that Dr. Kaplan changed his opinion during his in-court testimony from the opinion on his most recent report and that this change resulted in unfair surprise against which he could not adequately defend. The report at issue is the amended autopsy report prepared by Dr. Sabet, dated July 19, 2010. In that report, Dr. Kaplan signed his concurrence with Dr. Sabet's opinion that the manner of death was "undetermined" and that the cause of death was "asphyxia due to probable strangulation." At trial, Dr. Kaplan testified, "The cause of death to a reasonable degree of certainty given the totality of the information that is now provided to my office is that this is a homicide . . . ."

No objection was made to the changed opinion at trial. The petitioner did request a recess following his cross-examination, telling the court, "I need to use the bathroom pretty badly and was -- You gave us five minutes on Sabet. If we could have five minutes on him?" The court replied, "Okay. Just go back to the bailiff's office and do it, and go -- you can kill two birds with one stone back there." Following the recess, the defense did not make any objections or motions with regard to Dr. Kaplan's changed testimony. After the conclusion of the trial, the petitioner made a motion for a new trial on the basis of unfair surprise.

Unfair surprise arguments are premised on discovery Rule 16(1)(E) of the West Virginia Rules of Criminal Procedure, which states:

> Upon request of the defendant, the state shall disclose to the defendant a written summary of testimony the state intends to use under Rule 702, 703, or 705 of the Rules of Evidence during its case in chief at trial. The summary must describe the witnesses' opinions, the bases and reasons therefor, and the witnesses' qualifications.

The Court has set forth the following standard of review regarding discovery issues and the evidentiary and procedural rulings of the circuit court:

> The West Virginia Rules of Evidence and the West Virginia Rules of Civil Procedure allocate significant discretion to the trial court in making evidentiary and procedural rulings. Thus, rulings on the admissibility of evidence and the appropriateness of a particular sanction for discovery violations are committed to the discretion of the trial court. Absent a few exceptions, this Court will review

48

evidentiary and procedural rulings of the circuit court under an abuse of discretion standard.

Syl. pt. 1, *McDougal v. McCammon*, 193 W. Va. 229, 455 S.E.2d 788 (1995).

As a threshold matter, we must first establish that Mr. Rollins adequately preserved the error for appeal. Syllabus point 4 of *McDougal* states that "[i]n order to preserve for appeal the claim of unfair surprise as the basis for the exclusion of evidence, the aggrieved party must move for a continuance or recess." In *McDougal*, the Court addressed the defendant's failure to provide a discoverable video tape to the plaintiffs in violation of the discovery rules. The defendant denied the existence of the video tape in its response to an interrogatory, and the plaintiffs learned of the video tape when the defendant offered it for admission at trial.

The *McDougal* trial court allowed the defendant to present the video tape at trial despite the defendant's failure to provide the video tape during discovery. With respect to the trial court's decision, this Court said:

> There can be no doubt the video tape came as a surprise to the plaintiffs and was therefore "prejudicial" as to the damages claim. We also find the failure of the defendant to supplement was not inadvertent, but was willful. At the time of its admission, the video tape was of substantial practical importance to the proceedings. On the other hand, as we will discuss below, the plaintiffs had the ability to cure the prejudice, but did not avail themselves of those measures.

*Id.* at 238, 455 S.E.2d at 797. The Court continued:

49

> [W]e find it significant that the plaintiffs failed to exercise options available to ameliorate or dilute any unfair surprise resulting from the use of the disputed video tape. The plaintiffs could have moved for a continuance or sought a recess to take whatever action was necessary before the trial continued. Instead, for reasons not fully disclosed to this Court, the plaintiffs chose to continue with the trial as part of their strategy.

*Id.* at 239, 455 S.E.2d at 798.


In the case now before the Court, Mr. Rollins argues that because the defense requested a recess during Dr. Kaplan's testimony, he preserved the error for appeal. We disagree that the act of requesting a recess, alone, preserves an appeal. *McDougal*, when read in its entirety, makes clear that some prejudice must be articulable and that prejudice was uncorrectable despite the request for a continuance or recess. In this case, assuming that the recess was taken by the defense to, in part, address strategy for cross-examination of Dr. Kaplan, Mr. Rollins has failed to show that the recess he requested—and was granted—did not serve to ameliorate any prejudice that may have resulted from Dr. Kaplan's changed opinion. The defense specifically requested only a five minute recess. Had the defense been unable to cure the prejudice during the short recess it requested, it should have taken additional steps, such as requesting a longer recess or a continuance.

> As the Fourth Circuit Court of Appeals in DeBenedetto v. Goodyear Tire & Rubber Co., 754 F.2d 512, 518 (4th Cir.1985), stated where counsel decided not to move for a continuance, but rather proceed with trial: "They cannot now

50

> be allowed to alter retroactively their trial strategy." The same reasoning applies in the instant case.

*Id.*

We conclude that Mr. Rollins's decision to proceed with the trial was trial strategy, and we will not now alter retroactively that strategy. Mr. Rollins has not preserved the error for appeal. Furthermore, even if the defense was surprised by Dr. Kaplan's testimony, we are not persuaded that he would have been unable to properly question him on cross-examination regarding that testimony. The defense knew that Dr. Wecht, whose testimony the petitioner argued was cumulative of Dr. Kaplan's, would testify that the manner of death was homicide. If the testimony was cumulative as Mr. Rollins asserts, he would have been capable of dealing with Dr. Kaplan's changed opinion by treating it in a similar manner to Dr. Wecht's.

### F. Cumulative effect of errors

Mr. Rollins argues that the cumulative effect of the errors committed by the circuit court in this case warrants reversal of his conviction. Upon our review of this case, we did not find error, and so there is no basis for reversal pursuant to this assignment of error.

## IV.

## CONCLUSION

51

For the reasons set forth above, this Court affirms the circuit court's order entered December 18, 2012, convicting Mr. Rollins of first degree murder with no recommendation of mercy.

Affirmed.