IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2022 Term

_____

No. 21-0115
_____

**FILED**

**June 14, 2022**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent,

v.

KELLY MARIE TUSING,
Defendant Below, Petitioner.

_____

Appeal from the Circuit Court of Preston County
The Honorable Steven L. Shaffer, Circuit Judge
Criminal No. 19-F-49

AFFIRMED, IN PART;
REVERSED, IN PART, AND REMANDED WITH DIRECTIONS
_____

Submitted: May 18, 2022
Filed: June 14, 2022

Jeremy B. Cooper, Esq.                    Patrick Morrisey, Esq.
Blackwater Law PLLC                       Attorney General
Aspinwall, Pennsylvania                   Katherine M. Smith, Esq.
Counsel for Petitioner                    Assistant Attorney General
                                          Charleston, West Virginia
                                          Counsel for Respondent

JUSTICE WOOTON delivered the Opinion of the Court.

**SYLLABUS BY THE COURT**

1.      "'Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review.' Syllabus Point 1, *Chrystal R.M. v. Charlie A.L.,* 194 W.Va. 138, 459 S.E.2d 415 (1995)." Syl. Pt. 1, *State v. McCartney*, 228 W. Va. 315, 719 S.E.2d 785 (2011).

2.      "'W. Va. Const. art. VI, § 30, which requires that the object of an act of the Legislature 'shall be expressed in the title,' serves two salutary purposes. First, it is designed to give notice by way of the title of the contents of the act so that legislators and other interested parties may be informed of its purpose. Second, it is designed to prevent any attempt to surreptitiously insert in the body of the act matters foreign to its purpose which, if known, might fail to gain the consent of the majority.' Syl. pt. 1, *State ex rel. Walton v. Casey*, 179 W. Va. 485, 370 S.E.2d 141 (1988)." Syl. Pt. 5, *State ex rel. Marockie v. Wagoner*, 191 W. Va. 458, 446 S.E.2d 680 (1994).

3.      "'A cardinal rule of statutory construction is that significance and effect must, if possible, be given to every section, clause, word or part of the statute.' Syllabus Point 3, *Meadows v. Wal–Mart Stores, Inc.,* 207 W.Va. 203, 530 S.E.2d 676 (1999)." Syl. Pt. 2, *T. Weston, Inc. v. Mineral Cnty.,* 219 W. Va. 564, 638 S.E.2d 167 (2006).

i

4. Following a defendant's conviction on a charge of death of a child by parent, custodian, or guardian by child abuse, West Virginia Code § 61-8D-2a(a)(2017), the punishment authorized by West Virginia Code § 61-8D-2a(c) is an indeterminate sentence of fifteen years to life.

5. ""'"The action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion." Syllabus point 10, *State v. Huffman,* 141 W.Va. 55, 87 S.E.2d 541 (1955), *overruled on other grounds by State ex rel. R.L. v. Bedell,* 192 W.Va. 435, 452 S.E.2d 893 (1994).' Syl. pt. 2, *State v. Doonan,* 220 W.Va. 8, 640 S.E.2d 71 (2006)." Syl. Pt. 12, *State v. Rollins*, 233 W. Va. 715, 760 S.E.2d 529 (2014).

6. "A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases

are inconsistent, they are expressly overruled." Syl. Pt. 3, *State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995).

**WOOTON, Justice:**

In this case, the petitioner Kelly Marie Tusing ("the petitioner") appeals from her conviction in the Circuit Court of Preston County, West Virginia, on one count of death of a child by parent, custodian, or guardian by child abuse, W. Va. Code § 61-8D-2a(a) (2017).[1] She raises five issues, two relating to the determinate sentence of one hundred years imposed by the circuit court, two relating to the court's evidentiary rulings, and one relating to the sufficiency of the State's evidence to prove malice and intent.

Following careful review of the parties' written and oral arguments, the appendix record, and the applicable law, we affirm the petitioner's conviction, but reverse the sentence imposed and remand the matter for resentencing, all as set forth *infra*.

## I. Facts and Procedural Background

The facts of this case are tragic. In or about early 2018, the petitioner, who was a friend of David L.,[2] baby B.L.'s father, began babysitting the child on a fairly

---

[1] West Virginia Code § 61-8D-2a(a) provides that

> [i]f any parent, guardian or custodian maliciously and intentionally inflicts upon a child under his or her care, custody or control substantial physical pain, illness or any impairment of physical condition by other than accidental means, thereby causing the death of such child, then such parent, guardian or custodian is guilty of a felony.

[2] Because this case involves minors and sensitive matters, we follow our longstanding practice of using initials to refer to the children and the parties. *See, e.g.,* W.

1

frequent basis. On Thursday, November 8, 2018, at approximately 11:00 p.m., when B.L. was twelve months old,[3] she was brought to the petitioner's home to spend the night; in this regard, evidence in the appendix record suggests that the baby's parents had a tumultuous relationship and the petitioner was often asked to babysit when they were involved in prolonged fighting. B.L. remained in the petitioner's care through Saturday, November 10, 2018. Critically, the petitioner subsequently admitted that from the period of time between 11:00 a.m. and 2:03 p.m. on November 10 – other than a fifteen-to-twenty-minute visit from unidentified "church people" – she was alone in her home with her two children and B.L. At 2:03 p.m. the petitioner called Robin P., B.L.'s paternal grandmother, and told her that B.L. had fallen off a bed and was not breathing. When Robin P. and her husband arrived minutes later, B.L. was on the floor; according to Robin P., the baby was not breathing, her skin was purple, and her eyes "were rolled in the back of her head." Robin P.'s husband called 9-1-1, and immediately after an Emergency Medical Technician ("EMT") arrived and visually assessed the baby, he "yelled out the door to call life-flight[.]"

At West Virginia University Children's Hospital in Morgantown, West Virginia, B.L. was admitted in a comatose state and was put on a ventilator to help her breathe. One of her treating physicians, Dr. Melvin Wright, testified that the baby's brain

---

Va. R. App. P. 40(e); *State v. Edward Charles L.*, 183 W. Va. 641, 645 n.1, 398 S.E.2d 123, 127 n.1 (1990).

[3] The child was born in October of 2017.

was swollen, subdural bleeding was present, and that she had "multiple hemorrhaging in both eyes in all layers of the retina." Despite heroic measures taken to relieve the pressure on B.L.'s brain,[4] ultimately B.L.'s parents made the decision to remove her from life support due to her extensive brain injuries and anticipated life-long vegetative state.[5]

During the period of B.L.'s hospitalization, a police investigation commenced led by Trooper Levi Hall with the West Virginia State Police, who interviewed the petitioner on November 11, 2018; November 19, 2018; and January 11, 2019. During these interviews the petitioner confirmed that she was "alone in the house with the kids" during the operative time frame, and that B.L. began "[g]asping, [had a] dazed look, [was] foaming

---

[4] Physicians performed an external ventricular drain ("EVD") and hemicraniotomies of the right and left sides of B.L.'s skull. According to the appendix record, an EVD is a procedure in which a hole is drilled in the skull and a tube is threaded into the hole, "through the brain and . . . into the ventricles." A hemicraniotomy is a procedure in which a surgeon "take[s] out a large circle of bone [from the skull] and that frees up space for the brain to continue to expand."

[5] One of the baby's treating physicians testified that B.L. suffered a

> catastrophic brain injury, which should she survive, it would be very likely that she will be rendered profoundly disabled with lifelong disabilities manifested [as] an inability to breathe by herself, she would need to be on a ventilator to have a tracheostomy tube inserted in her throat and be hooked up to a ventilator all the time. She will be blind. She will not be able to see and interact with her environment. She wouldn't probably – very likely she wouldn't be able to smile to her parents or recognize her parents. She would never walk, never talk. She would be, essentially, confined all her life in a long-term care facility on technology.

3

at the mouth, [and] appeared to be having a seizure, twitching." The petitioner also admitted that she had deleted messages found on her phone from November 10, 2018, which, together with the fact that "[t]he doctors had already told [Trooper Hall] that [the baby's condition] wasn't from a fall," eventually led the officer to exclude everyone other than the petitioner from the criminal inquiry:

> From the doctor[s'] opinions and their timeline. They all said that [B.L. would have collapsed immediately upon receiving that injury. The fact that it wasn't from a fall, and from [the petitioner's] timeline, she puts herself at the house alone with [B.L.] for several hours. Everyone else in this case agrees with that, there's no dispute on the timeline. [The petitioner] was with that child for several hours alone.

Eventually, on March 5, 2019, the petitioner was indicted on one count of death of a child by parent, custodian, or guardian by child abuse, W. Va. Code § 61-8D-2a(a). On October 5, 2020, the case proceeded to trial, with the State calling nine witnesses and the defense calling three witnesses. In light of the petitioner's admission to the police that she was alone in the house with the baby during the critical three-hour window of time, the key issue in the trial was whether B.L.'s catastrophic brain injuries were sustained on November 10, 2018, when the child was in the petitioner's care, or two to fourteen days earlier, as the petitioner's expert opined. In this regard, the State called three medical experts: Dr. Melvin Wright and Dr. Claudiu Faraon, who treated B.L. at WVU Hospital's Pediatric Intensive Care Unit, and Dr. Allen Mock, the Chief Medical Examiner of West Virginia. Dr. Wright testified that B.L. was admitted to the Unit in a comatose state and was hooked up to a ventilator to help her breathe. The baby's brain was swollen and

4

subdural bleeding was present; additionally, she had "hemorrhaging in both eyes in all layers of the retina." Dr. Wright testified unequivocally that in his opinion, B.L.'s injuries could not have been caused from a fall from a bed and indeed, could not have been sustained "from anything other than abusive head trauma." Dr. Faraon stated that B.L.'s injuries were "highly, highly indicative of nonaccidental injury to the brain, nonaccidental trauma or inflicted brain injury." He further testified that the injuries could not have been sustained accidentally, and that within minutes of sustaining the injuries, the baby would "become sleepy or lethargic, unable to wake up . . . [a]nd then she would progress to become unresponsive and to become comatose." Dr. Mock testified that B.L.'s injuries, all of which were observed on autopsy, were the result of "multiple blunt force injuries of the head." He agreed with the testimony of Drs. Wright and Faraon that the injuries were not caused by a fall from a bed, classifying the cause of B.L.'s death as homicide.

In contrast, the petitioner's expert, Dr. David Myerberg, testified that the CT scans taken soon after B.L.'s admission to the hospital showed the existence of a previous injury that would have occurred two to fourteen days prior to November 10: "if you look on the outside of that subdural hemorrhage, you see another line that is really fluid, and that doesn't happen in an acute subdural hemorrhage."[6] Dr. Myerberg further opined that the baby's fall from the bed – reported by the petitioner as an accident that occurred when

---

[6] Dr. Myerberg testified that the treating physicians had, for reasons unexplained, ignored the findings of the hospital's radiologist with respect to clear indications of prior injury shown on the scans.

she was out of the room – would be sufficient to trigger the sequelae of that earlier injury. Finally, in contrast to the testimony of the treating physicians that B.L.'s retinal hemorrhaging was yet another indication of multiple blunt force trauma to her head, whether by blows or shaking, Dr. Myerberg concluded that B.L.'s retinal hemorrhaging was not indicative of the force of the trauma to her head but rather was most likely the result of the pressure from her brain injury; "if you have pressure in the brain, it's going to move everything out of the way."

On October 9, 2020, the jury returned a verdict of guilty, and by order entered on January 7, 2021, the circuit court sentenced the petitioner to a determinate term of 100 years in prison.[7] This appeal followed.

## II. Standard of Review

The petitioner raises five issues for this Court's review on appeal, although only four are addressed in this opinion.[8] Because the assigned errors have different standards of review, the applicable standard is set forth in the discussion of each issue.

---

[7] Although the record of the sentencing hearing clearly shows that both the prosecutor and defense counsel believed the sentence prescribed by West Virginia Code § 61-8D-2a(c) to be an indeterminate sentence of fifteen years to life, the State now argues that the circuit court's imposition of a determinate sentence was appropriate. *See* text *infra*.

[8] *See* text *infra*. Given our conclusion herein that the petitioner's determinate sentence was illegal, her challenge to the proportionality of that sentence is moot.

6

### III. Discussion

The first issue raised by the petitioner is the legality of her sentence; specifically, she challenges the circuit court's ruling that West Virginia Code § 61-8D-2a(c) permits the imposition of a determinate sentence within a range of fifteen years to life. Our standard of review here is well established: "'[w]here the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review.' Syllabus Point 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995)." Syl. Pt. 1, *State v. McCartney*, 228 W. Va. 315, 719 S.E.2d 785 (2011).

As previously set forth, the petitioner was convicted of one count of death of a child by parent, custodian, or guardian by child abuse, W. Va. Code § 61-8D-2a(a),[9] for which the penalty is set forth in West Virginia Code § 61-8D-2a(c):

> Any person convicted of a felony described in subsection (a) or (b) of this section shall be imprisoned in a state correctional facility for a period of fifteen years to life. A person imprisoned pursuant to the provisions of this section is not eligible for parole prior to having served a minimum of fifteen years of his or her sentence.

We begin with a brief overview of the statutory history. The current version of West Virginia Code § 61-8D-2(a)(c) was codified following passage of the Enrolled Committee Substitute for Senate Bill 288 on April 7, 2017:

---

[9] *See supra* note 1.

AN ACT to amend the Code of West Virginia, 1931, as amended, by adding thereto a new section, designated § 61-8D-1a; and to amend and reenact § 61-8D-2a of said code, all relating to naming the law[10] and increasing the penalty for death of a child by a parent, guardian, custodian or other person by child abuse to *an indeterminate term of fifteen years to life*.

(Footnote and emphasis added). This clear expression of the object of the Bill, set forth in its title,[11] was faithful to the command of article VI, section 30 of the West Virginia Constitution.[12]

---

[10] West Virginia Code § 61-8D-1a states in its entirety that "[t]he amendments made to this article during the 2017 legislative session shall be known as Emmaleigh's law."

[11] The State characterizes this language not as the title of the Bill but rather as a "preamble," relying on *State ex rel. Lorenzetti v. Sanders*, 235 W. Va. 353, 360, 774 S.E.2d 19, 26 (2015), which in turn relied on *Slack v. Jacob*, 8 W.Va. 612, 628 (1875) for the proposition that "it is chiefly from the main body the purview of the act, that the will of the Legislature is to be learned; when this is clear and express, the *preamble* will not avail to contradict it." *Slack*, 8 W. Va. at 613, Syl. Pt. 7, in part (emphasis added). Our research indicates that these cases are outliers in our jurisprudence insofar as they adopt this terminology and base their holdings on its use. However, we need not determine the continuing vitality of *Lorenzetti* and *Slack* because in the instant case the so-called preamble does not contradict the statutory language of West Virginia Code § 61-8D-2a(c) but rather is wholly consistent with it.

[12] Article VI, section 30 of the West Virginia Constitution, **Acts to Embrace But One Object – Time of Effect**, provides in its entirety that

[n]o act hereafter passed, shall embrace more than one object, and that shall be expressed in the title. But if any object shall be embraced in an act which is not so expressed, the act shall be void only as to so much thereof, as shall not be so expressed, and no law shall be revived, or amended, by reference to the title only; but the law revived, or the section amended, shall be inserted at large, in the new act. And no act of the legislature, except such as may be passed at the first session under this Constitution, shall take effect until the vote of two thirds of the members elected to each house, taken by yeas and nays, otherwise direct.

W. Va. Const. art. VI, § 30, which requires that the object of an act of the Legislature 'shall be expressed in the title,' serves two salutary purposes. First, it is designed to give notice by way of the title of the contents of the act so that legislators and other interested parties may be informed of its purpose. Second, it is designed to prevent any attempt to surreptitiously insert in the body of the act matters foreign to its purpose which, if known, might fail to gain the consent of the majority. Syl. pt. 1, *State ex rel. Walton v. Casey*, 179 W. Va. 485, 370 S.E.2d 141 (1988).

Syl. Pt. 5, *State ex rel. Marockie v. Wagoner*, 191 W. Va. 458, 446 S.E.2d 680 (1994); *see also* Syl. Pt. 6, in part, *McCoy v. VanKirk*, 201 W. Va. 718, 722, 500 S.E.2d 534, 538 (1997) ("A title must, at a minimum, furnish a 'pointer' to the challenged provision in the act. The test to be applied is whether the title imparts enough information to one interested in the subject matter to provoke a reading of the act.") (citing Syl. Pt. 2, in part, *Walton v. Casey*, 179 W. Va. at 485, 370 S.E.2d at 141).

Of particular relevance to this appeal, the prior version of section 61-8D-2a(c) provided that

Any person convicted of a felony described in subsection (a) or (b) of this section shall be punished by a *definite* term of imprisonment in the penitentiary which is not less than ten nor more than forty years. A person imprisoned pursuant to the provisions of this section is not eligible for parole prior to having served a minimum of ten years of his or her sentence or the minimum period required by the provisions of section thirteen, article twelve, chapter sixty-two of this code, whichever is greater.

(Emphasis added). Both parties to this appeal agree that the prior version of the statute established a determinate sentence. Further, the parties agree that the intent of the 2017

9

amendment was to increase the punishment for a violation of West Virginia Code § 61-8D-2a(a), death of a child by parent, custodian, or guardian by child abuse, by ensuring that any individual found guilty of the offense would be required to serve at least fifteen years before becoming eligible for parole consideration, rather than ten years as was the case with the predecessor statute. This is where the parties' agreement ends. The issue below, and the issue here on appeal, is whether the 2017 amendment established a determinate or an indeterminate sentence.

At the petitioner's sentencing, although both the State and the defense proceeded on the apparent belief that the statutory sentence is an indeterminate term of fifteen years to life, the circuit court found that "that statute is a determinate statute that gives the Court the parameter to pronounce sentence on Ms. Tusing." The basis for the court's decision was its observation that the "code section does not state *not less than* 15 years *or more than* life[,]" a linguistic construction often seen in statutes establishing indeterminate sentences. The State now contends that the circuit court was correct, and doubles down on the court's rationale by asserting that the language "not less than *x*, nor more than *y*" is "the *characteristic* indeterminate sentence language." (Emphasis added). We disagree with this analysis for two primary reasons.

First, the circuit court was simply incorrect in its assumption that "not less than . . . or more than" is the *sine qua non* of an indeterminate sentence. To the contrary, Chapter 61 of the Code contains a number of statutes which use the construction in

10

sentences that are expressly designated as determinate. For example, in West Virginia Code § 61-3C-14b(b) (2020), the Legislature set forth the following punishment for soliciting a minor via computer and traveling to engage the minor in prohibited sexual activity: "imprison[ment] in a state correctional facility for a determinate sentence of not less than five nor more than thirty years[.]"; *see also* West Virginia Code § 61-7-12 (2020) (one convicted of wanton endangerment with a firearm "shall be confined in the penitentiary for a definite term of years of not less than one year nor more than five years[.]"); West Virginia Code § 61-8B-5(b) (2020) (one convicted of sexual assault in the third degree "shall be imprisoned in a state correctional facility for a definite term of years of not less than one year nor more than five years[.]"); West Virginia Code § 61-2-3 (2020) (one convicted of second degree murder "shall be punished by a definite term of imprisonment in the penitentiary which is not less than ten nor more than forty years."); West Virginia Code § 61-2-4 (2020) (one convicted of voluntary manslaughter "shall be punished by a definite term of imprisonment in the penitentiary which is not less than three nor more than fifteen years."). Indeed, in the predecessor statute to West Virginia Code § 61-8D-2a(c) – which both parties agree was a determinate sentence – the punishment prescribed was a "definite term of imprisonment in the penitentiary which is not less than ten nor more than forty years." Second, in any event no amount of linguistic gymnastics can overcome the clear and unambiguous intent expressed by the Legislature in the 2017 enactment of section 61-8D-1a and reenactment and amendment of section 61-8D-2a. Such intent was clearly expressed in the title to the Bill, *see* text *supra*, and then again in the Legislature's 2017

Bill Summary,[13] which described the Committee Substitute for Senate Bill 288 as a "bill increas[ing] the penalty for child abuse causing death from a determinate sentence of 10-40 years to an *indeterminate sentence of 15 years to life*." (Emphasis added). In short, where there is no ambiguity in the Bill's title, in the statutory language, or in the legislative description thereof, there is no room for the type of linguistic exegesis employed by the circuit court.

The State further argues that the circuit court's decision should be affirmed on any of several alternate grounds. First, the State contends that section 61-8D-2a(c) clearly and unambiguously establishes a determinate sentence of fifteen years to life, and therefore what the State persists in calling the "preamble" cannot be considered. In that regard,

> [w]hen this Court's resolution of an issue requires us to pass upon the meaning of a statute or rule, "[w]e look first to the statute's language. If the text, given its plain meaning, answers the interpretive question, the language must prevail and further inquiry is foreclosed." *Appalachian Power Co. v. State Tax Dep't of West Virginia*, 195 W. Va. 573, 587, 466 S.E.2d 424, 438 (1995). *See also Foster Found. v. Gainer*, 228 W. Va. 99, 110, 717 S.E.2d 883, 894 (2011) ("Statutes whose language is plain must be applied as written."); Syl. pt. 2, *State v. Epperly*, 135 W. Va. 877, 65 S.E.2d 488 (1951) ("A statutory provision [that] is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect.").

---

[13] https://www.wvlegislature.gov/legisdocs/committee/senate/judiciary/jud_summaries_2017.pdf.

*Brickstreet Mut. Ins. Co. v. Zurich Am. Ins. Co.*, 240 W. Va. 414, 423, 813 S.E.2d 67, 76 (2018). The problem with this argument is that the State's factual premise is fatally flawed in multiple respects. First, as we have previously explained, *see supra* note 11, the language that the State would have this Court ignore is not a "preamble"; rather, it is the title of the Bill. Second, it is difficult to imagine a circumstance in which this Court would find that a statute is clearly and unambiguously something other than what the Legislature has clearly and unambiguously described it to be: "an *indeterminate sentence* of 15 years to life." Third, the State overlooks the fact that while the predecessor statute expressly stated that the penalty (then ten-to-forty years) was "definite" (a word used interchangeably with determinate throughout the criminal penalty provisions of the Code), the amended statute does not. In short, regardless of the State's desire to read the word "definite" or "determinate" into West Virginia Code § 61-8D-2a(c), it is simply not there. *See Banker v. Banker*, 196 W. Va. 535, 546-47, 474 S.E.2d 465, 476-77 (1996) ("It is not for this Court arbitrarily to read into [a statute or administrative rule] *that which it does not say*. Just as courts are not to eliminate through judicial interpretation words that were purposely included, we are obliged not to add to statutes [and administrative rules] something the Legislature purposely omitted.") (emphasis added and citations omitted).

Next, the State argues that the second sentence of section 61-8D-2a(c), which states that "[a] person imprisoned pursuant to the provisions of this section is not eligible for parole prior to having served a minimum of fifteen years of his or her sentence[,]" is wholly superfluous if the sentence of "fifteen years to life" is indeterminate. This follows,

13

the State contends, because an individual serving an indeterminate sentence of fifteen years to life will always have to serve the minimum term, fifteen years, before becoming eligible for parole. *See id.* § 62-12-13(b)(1)(A) ("Any inmate of a state correctional institution is eligible for parole if he or she . . . [h]as served the minimum term of his or her indeterminate sentence or has served one fourth of his or her definite term sentence, as the case may be[.]"). Thus, the State concludes, because "[i]t is not presumed that the Legislature intended any part of a statute to be without meaning," *Jackson v. Monitor Coal & Coke Co.*, 98 W. Va. 58, 63, 126 S.E. 492, 494 (1925), this Court must, in effect, presume the opposite: that the inclusion of the second sentence in the statute conclusively shows that the statutory sentence is determinate.

We decline to take this giant leap of logic. We have held that "'[a] cardinal rule of statutory construction is that significance and effect must, if possible, be given to every section, clause, word or part of the statute.' Syllabus Point 3, *Meadows v. Wal–Mart Stores, Inc.,* 207 W.Va. 203, 530 S.E.2d 676 (1999)." Syl. Pt. 2, *T. Weston, Inc. v. Mineral Cnty.*, 219 W. Va. 564, 638 S.E.2d 167 (2006). In the case at bar, the second sentence of section 61-8D-2a(c) indeed has significance: it explains both the legislative intent to increase the punishment and also how the new indeterminate sentence will have that effect: pursuant to the indeterminate sentence a defendant will have to serve at least fifteen years before being eligible for parole, whereas a defendant sentenced under the old statute to the maximum determinate forty-year sentence would be eligible for parole in ten years. In this regard, it is noteworthy that the second sentence of the statute mirrors a similar provision

14

contained in the predecessor statute, making the intent of the Legislature obvious: by deleting the word "definite" and increasing the minimum time served before an individual becomes eligible for parole consideration, the Legislature puts everyone on notice that the crime will henceforth carry a heavier penalty than it did before.

Finally, the State argues that the sentence imposed by the circuit court should be affirmed as a definite (determinate) term imposed pursuant to West Virginia Code § 61-11-16, which provides, in relevant part, that

> [e]very sentence to the penitentiary of a person convicted of a felony for which the maximum penalty prescribed by law is less than life imprisonment . . . shall be a general sentence of imprisonment in the penitentiary. In imposing this sentence, the judge may, however, designate a definite term, which designation may be considered by the Board of Probation and Parole [Division of Corrections] as the opinion of the judge under the facts and circumstances then appearing of the appropriate term recommended by him to be served by the person sentenced.

We reject the State's suggestion, raised for the first time at oral argument, that section 61-11-16 somehow allows a circuit judge to override a statutory indeterminate sentence and substitute a determinate sentence. We specifically held to the contrary in *Cohn v. Ketchum*, 123 W. Va. 534, 17 S.E.2d 43 (1941), writing that "[u]nder the indeterminate sentence law, the trial court in imposing sentence is only empowered to impose a general sentence of imprisonment in the penitentiary as provided by law for the offense involved[.]" *Id*. at 534, 17 S.E.2d at 43, Syl. Pt. 4, in part. We further held that "the inclusion in [the] court's order . . . that defendant should be incarcerated for the term of one year, *was without effect* and

conferred no rights on defendant to be released from imprisonment after one year." *Id*. (emphasis added). We acknowledge, however, that the statute allows a court to add a suggestion to its sentencing order as to the length of time an offender should serve, in the court's opinion, before being granted parole[14] – a recommendation that is not binding, as parole eligibility is determined by statute, W. Va. Code § 62-12-13(b)(1)(A), and "[t]he final determination regarding the release of inmates from penal institutions . . . shall remain within the exclusive jurisdiction of the board of probation and parole[,]" W. Va. Code § 62-13-2(b) (2020).[15] *See Hamrick v. Boles*, 229 F. Supp. 570, 571 (N.D.W. Va. 1964) ("The indeterminate sentence statute (Code Chapter 61, Article 11, Section 16; Michie's Code, Section 6128), which is applicable to the amended robbery statute, makes provision for recommendations of a definite term by the sentencing judge, but those recommendations are not binding upon the Board of Pardon and Parole, which, alone, has jurisdiction to determine the period of confinement under the indeterminate sentence."). In summary, we find that West Virginia Code § 61-11-16 does not alter the circuit court's

---

[14] For example*, in State v. Bennett*, 172 W. Va. 123, 304 S.E.2d 28 (1983), the circuit court recommended that the defendant serve three years of his one-to-five-year sentence. Assuming the accrual of good time by the defendant, the defendant would have discharged his sentence in 2 ½ years; thus, it would have been impossible for the board of probation and parole to follow the court's recommendation even if it were otherwise inclined to do so. Nonetheless, we found no error in the court's recommendation, inasmuch as the board has the authority to follow or ignore any such recommendation.

[15] Although the Legislature has "transferred the administration of the board of probation and parole to the department of military affairs and public safety," W. Va. Code § 62-13-7 (2022), the decision-making function of the board with respect to an inmate's release on parole remains intact.

16

duty to impose an indeterminate sentence and, on remand, we direct the court to impose such an indeterminate sentence as statutorily required. However, we leave it to the circuit court, as envisioned by West Virginia Code § 61-11-16, to make any non-binding recommendations that it may, in its discretion, deem appropriate as to the minimum period of confinement the petitioner should serve before parole is granted.

We are sympathetic to the circuit court's conclusion, after having listened to all of the facts and evidence at trial and reviewed all of the facts and evidence compiled for purposes of sentencing – including evidence that, to the court, signified the petitioner's lack of remorse and attempt to shift the blame – that this was a heinous crime that called for a very severe punishment, one that would extend the petitioner's parole eligibility date well beyond fifteen years. Nonetheless, punishment for the crime of which the petitioner stands convicted cannot extend beyond that clearly and unambiguously established by the Legislature in West Virginia Code § 61-8D-2a(c): an indeterminate sentence of fifteen years to life. So that there can be no confusion in the future, we now hold that following a defendant's conviction on a charge of death of a child by parent, custodian, or guardian by child abuse, West Virginia Code § 61-8D-2a(a)(2017), the punishment authorized by West Virginia Code § 61-8D-2a(c) is an indeterminate sentence of fifteen years to life. Accordingly, we reverse the petitioner's sentence and remand this case for imposition of an indeterminate sentence of fifteen years to life, in conformity with the statute.

Next, the petitioner challenges two evidentiary rulings made by the circuit court, the first admitting photographs which the petitioner claims to be "gruesome," and the second refusing to admit a letter opinion prepared by a defense medical expert who did not testify at trial. With respect to our review of both of these rulings, we have held that

> """[t]he action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion." Syllabus point 10, *State v. Huffman,* 141 W.Va. 55, 87 S.E.2d 541 (1955), *overruled on other grounds by State ex rel. R.L. v. Bedell,* 192 W.Va. 435, 452 S.E.2d 893 (1994).' Syl. pt. 2, *State v. Doonan,* 220 W.Va. 8, 640 S.E.2d 71 (2006)."

Syl. Pt. 12, *State v. Rollins*, 233 W. Va. 715, 760 S.E.2d 529 (2014). We turn now to these assignments of error.

First, the petitioner contends that the circuit court erred by admitting so-called "gruesome photographs," including autopsy photographs, without considering the prejudicial impact of the evidence. In this regard, Rule 403 of the West Virginia Rules of Evidence provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

In an in limine motion filed prior to trial, the State filed a motion to admit thirteen photographs, including autopsy photographs, at trial. Those photographs, twelve of which are included in the appendix record,[16] were described as follows:

1.  B.L. in hospital on November 11, 2018, after receiving emergency surgery, showing medical intervention;

2.  B.L. in hospital on November 11, 2018, showing bruise above eye;

3.  B.L. in hospital on November 11, 2018, after receiving emergency surgery, showing medical intervention;

4.  Condition of B.L. following death on November 18, 2018;

5.  Condition of B.L. following death on November 18, 2018;

6.  Autopsy photograph showing scapular hemorrhages;

7.  Autopsy photograph showing scapular hemorrhages;

8.  Autopsy photograph showing superficial bruising on B.L.'s head;

9.  Photograph excluded as duplicative, *see supra* note 16;

10. Autopsy photograph showing subscalpular hemorrhage, subdural hemorrhage, subarachnoid hemorrhage, cerebral edema, and cerebral contusion;

11. Autopsy photograph showing subdural hemorrhage;

12. Autopsy photograph showing cerebral contusion; and

13. Autopsy photograph showing optic nerve sheath hemorrhage.

---

[16] The circuit court refused to admit one of the photographs on the ground that it was duplicative, and this photograph has not been included in the record.

19

Over the petitioner's objection that the photographs were "gruesome," *see* text *infra*, the circuit court initially ruled that photographs 1, 2, 3, 4, 5, and 8 would be admitted as evidence at trial, concluding that although they were "undeniably difficult photographs to view," they were necessary to the State's case to demonstrate "the extent of medical intervention, bruising, and general condition of B.L." Thereafter, following an in camera hearing on the fourth day of trial in which the Chief Medical Examiner of West Virginia testified "regarding whether the [remaining] photographs pertained to his testimony and what injuries each photograph would show[,]" the court ruled that photographs 6, 7, 8,[17] 10, 11, 12, and 13 would also be admitted as evidence.

Any analysis of a "gruesome photographs" objection must begin with this Court's seminal opinion in *State v. Derr*, 192 W. Va. 165, 451 S.E.2d 731 (1994), in which we held that

> Rule 401 of the West Virginia Rules of Evidence requires the trial court to determine the relevancy of the exhibit on the basis of whether the photograph is probative as to a fact of consequence in the case. The trial court then must consider whether the probative value of the exhibit is substantially outweighed by the counterfactors listed in Rule 403 of the West Virginia Rules of Evidence. As to the balancing under Rule 403, the trial court enjoys broad discretion. The Rule 403 balancing test is essentially a matter of trial conduct, and the

---

[17] Although photograph 8 had previously been deemed admissible, the court noted that "this exhibit was discussed during the *in camera* hearing and reidentified, thus the [c]ourt included it in the discussion regarding the exhibit in this order."

20

> trial court's discretion will not be overturned absent a showing
> of clear abuse.

*Derr*, 192 W. Va. at 168, 451 S.E.2d at 734.[18]

The entirety of the petitioner's "gruesome photographs" argument hinges on the circuit court's failure to explicitly find that the probative value of the photographs, which the court discussed at some length, outweighed their prejudicial impact, which the court mentioned only obliquely, noting that the photos were "undeniably difficult . . . to view." In making this argument, the petitioner would have this Court *presume* that the prejudicial impact of autopsy photographs of a baby – for the existence of some prejudicial impact cannot reasonably be denied in such a case – is so great that exposure to this evidence would cause the jury to rush headlong to a guilty verdict regardless of each juror's sworn oath to decide the case based solely on the evidence and the law. *See supra* note 18. This is exactly the approach eschewed in *Derr* and all of the other "gruesome photos" challenges in the decades that followed. *See, e.g.*, *State v. Berry*, 227 W. Va. 221, 231, 707 SE.2d 831, 841 (2011) ("'The average juror is well able to stomach the unpleasantness of exposure to the facts of a murder without being unduly influenced. . . . [G]ruesome or

---

[18] This was a marked departure from our earlier case law, which unquestioningly accepted a presumption that the "impact on the jury [of gruesome photos] is such that it will become so incensed and inflamed at the horrible conditions depicted that it will not be able to objectively decide the issue of the defendant's guilt[,]" *State v. Clawson*, 165 W. Va. 588, 612, 270 S.E.2d 659, 674 (1980), and therefore the photos "must have something more than probative value . . . [t]he State must show that they are of essential evidentiary value to its case." *State v. Rowe*, 163 W. Va. 593, 595-96, 259 S.E.2d 26, 28 (1979).

21

inflammatory pictures exists more in the imagination of judges and lawyers than in reality.'") (citations omitted); *State v. Copen*, 211 W. Va. 501, 505, 566 S.E.2d 638, 642 (2002) ("a trial court's exercise of discretion in ruling on the admission of potentially gruesome photographs should not be overturned by this Court absent a showing of clear abuse."). Further, in asking this Court to presume that the prejudicial impact of this evidence outweighs its probative value, the petitioner ignores our well-established standard of review:

> The balancing of probative value against unfair prejudice is weighed in favor of admissibility and rulings thereon are reviewed only for an abuse of discretion. . . . In considering the prejudicial effect of prior bad acts, we have eschewed any absolute or *per se* rules. Rather, this Court applies a reasonableness standard and examines the facts and circumstances of each case. This Court reviews disputed evidence in the light most favorable to its proponent, *maximizing its probative value and minimizing its prejudicial effects*.

*State v. LaRock*, 196 W. Va. 294, 312, 470 S.E.2d 613, 631 (1996) (citations omitted and emphasis added).

In the absence of evidence showing that the prejudicial impact of the photographs was such that the jury would have been unable "to objectively decide the issue of the defendant's guilt[,]" *Clawson*, 165 W. Va. at 612, 270 S.E.2d at 674, we decline to disturb the ruling of the circuit court. In this regard, we conclude that this case, dealing with photographs that were, in the words of the circuit court, "undeniably difficult . . . to view," is markedly similar to *State v. Waldron*, 218 W. Va. 450, 624 S.E.2d 887 (2005), where we wrote that

22

[t]he exhibits were not hideous, ghastly, horrible, or dreadful. They were relevant and probative in showing the jury the condition, identity, and location of wounds on the body, and any *speculative prejudicial effect* was outweighed. The photographs simply were not of the nature to arouse passion and cause the jury to decide this case on improper grounds. Here, we refuse to interfere with the trial court's exercise of its discretion in admitting the photographs or in allowing testimony regarding the photographs.

*Id.* at 458, 624 S.E.2d at 895 (emphasis added).

In her third assignment of error, the petitioner contends that the circuit court erred in refusing to admit a letter that was, as she characterizes it, "obtained from another doctor and relied upon by the [p]etitioner's expert witness." The initial – and ultimately fatal – flaw in this argument is that the petitioner's expert witness, Dr. David Myerberg, specifically testified that he did *not* rely on the letter opinion of Dr. Frederick Gabriele, a neuroradiologist, in formulating his own opinion.

> Q: Dr. Myerberg, I'm going to show you – this is just a copy, this is not what's in evidence, Mr. Frame's going to put it in evidence, but that's a copy of what you're talking about from Dr. Gabriel[e]; correct?
>
> A: Yes, that is correct.
>
> Q: Okay. And that's this document right here, that was written by Dr. Gabriel[e]; correct?
>
> A: That is correct.
>
> Q: And this is his opinion, correct?
>
> A: That's his opinion, yeah.
>
> Q: That – this document is his opinion. And you indicated – well, it's indicated in the expert witness disclosure

23

that the correct reading of the initial CT scan was relied upon by you – by Dr. Myerberg – or I'm sorry, Dr. Gabriel[e], he's the one who provided you that opinion?

A:      He provided me that opinion when I went to him. When I first saw the CT scan myself, that was my opinion.

Q:      But you're not a radiologist, either, right?

A:      No, ma'am. I'm not.

Q:      Okay. *And so you relied on this opinion to make your findings, is that what you're telling the Court?*

A:      *No, I'm telling the Court that I basically confirmed my opinions by going to Dr. Gabriel[e].* That was my – my way of practicing medicine when I was practicing medicine, and it's the way that I conduct myself as an expert.

(Emphasis added). Thus, the letter opinion of Dr. Gabriele did not fall within the ambit of

Rule 703 of the West Virginia Rules of Evidence, which provides, in relevant part, that

> [a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

*See Wilson v. Wilson*, 208 W. Va. 581, 583, 542 S.E.2d 402, 404 (2000) (psychologist may

base his or her opinions upon "observations, interviews, and counseling sessions with . . .

patients and their families. Such opinions are permissible under Rule 703 and should not

be disregarded as hearsay."). In the instant case, the letter opinion from Dr. Gabriele shed

no light on Dr. Myerberg's reasoning in arriving at his own opinion, which is the "limited

and independent purpose" for the admission of otherwise inadmissible data pursuant to

Rule 703. *State v. Lambert*, 236 W. Va. 80, 96, 777 S.E.2d 649, 665 (2015) (citing 2 Louis

24

J. PALMER, JR., ROBIN JEAN DAVIS & FRANKLIN D. CLECKLEY, HANDBOOK ON EVIDENCE

FOR WEST VIRGINIA LAWYERS § 705.02, at 154–55). Rather, Dr. Myerberg sought an

opinion from Dr. Gabriele for the sole purpose of confirming an opinion he had already

formed, as follow-up questioning of Dr. Myerberg by the circuit court made abundantly

clear:

QUESTIONING BY THE COURT:

> Q: I just want to get clarification. Dr. Myerberg, it's my understanding that you're saying you looked at this, you looked at these scans and you formed your own opinion.
>
> A: Correct.
>
> Q: And basically, all you did with Dr. Gabriel[e] was you went down there and he confirmed your opinion.
>
> A: Absolutely.
>
> Q: Nothing he did helped you make your opinion?
>
> A: No.

Following this exchange, the court made the following findings of fact and conclusions of

law, the former which are indisputable and the latter which are, at the very least, within the

broad ambit of the court's discretion:[19]

> Okay. I'm going to stand by my ruling. I believe that that clarifies my ruling. That basically [Dr. Myerberg] did not use an opinion of another expert to form his own opinion. [Dr.

---

[19] A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard." Syl. Pt. 5, in part, *State v. Gibbs*, 238 W. Va. 646, 797 S.E.2d 623 (2017); *Rollins*, 233 W. Va. at 720, 760 S.E.2d at 535, Syl. Pt. 12, in part.

Myerberg] formed his own opinion and all he was doing was looking for confirmation.

And so basically Dr. Gabriel[e] is not here to be qualified as an expert, so basically, you know, I'm not going to permit [Dr. Gabriele's] letter to be shown to the jury.

Further, our case law has never gone so far as to classify one expert's letter opinion on the merits of a specific case as "facts or data" upon which a second expert may reasonably rely in formulating his or her opinion in that same case. Statistics, learned treatises, peer-reviewed articles in professional magazines – these types of materials are far removed from a letter opinion on the merits of the particular case, prepared by an individual who will not be subject to cross-examination. And finally, although Dr. Gabriele's letter opinion was not admitted into evidence and therefore not published to the jury, the circuit court permitted Dr. Myerberg to testify that "Like Dr. Wright, I wanted to be absolutely sure that I was seeing this [the evidence of prior injury] well, and I consulted as he did a neuroradiologist, who agreed with my findings." Therefore, prejudice, if any, arising from the circuit court's refusal to admit the letter was minimal at best, and we find no abuse of discretion in regard to the circuit court's ruling.

Finally, the petitioner challenges the sufficiency of the evidence to establish two essential elements of the crime, malice and intent. Our standard of review, reiterated many times over the past decades, was formulated in syllabus point three of *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995):

A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.

We begin with the operative statute that defines the crime of death of a child by parent, custodian, or guardian by child abuse, W. Va. Code § 61-8D-2a(a). We have held that

> [t]o obtain a lawful conviction under West Virginia Code § 61-8D-2a(a), the State must prove that the defendant "maliciously and intentionally inflict[ed] upon a child under his or her care, custody or control substantial physical pain, illness or any impairment of physical condition by other than accidental means, thereby causing the death of such child[.]"

*State v. Bowen*, No. 19-1162, 2022 WL 972260, at *5 (W. Va. Mar. 31, 2022) (memorandum decision). The petitioner's argument on this point is remarkably brief – the bulk of the argument is nothing more than a verbatim recitation of the parties' arguments made to the circuit court in support of or in opposition to the petitioner's motion for judgment of acquittal at the close of the State's case-in-chief – and boils down to the fact that "there [was] no evidence of use of a deadly weapon, and no evidence of ill will or a source of antagonism between the [petitioner] and the decedent."

27

This argument must fail, as "'malice' and 'intent' may be inferred from the nature of the criminal conduct." *Bowen*, 2022 WL 972260, at *5. As the State points out, the evidence was undisputed that B.L. was in the petitioner's sole care for at least three hours prior to the baby's becoming unresponsive; the petitioner did not call 9-1-1; although the petitioner claimed that the baby's traumatic brain injuries resulted from a fall from a bed, the treating physicians all agreed that such a fall could not have caused those injuries; and those physicians all agreed that the injuries were not accidental but rather were caused by intentional, abusive head trauma. In *Bowen*, on facts substantially similar to those in the case at bar, we found that

> [a]t trial, both medical experts, Dr. Mock and Dr. Phillips, testified that L.H.'s death was caused by a series of blunt force injuries to L.H.'s head, which were not accidental. The evidence also showed that petitioner was alone with L.H. during the timeframe in which those injuries were inflicted. This evidence supports the conclusion that petitioner inflicted the blunt force injuries upon L.H. that caused, among other things, her brain to swell; her left eye to protrude; and ultimately, her death. *The level of brutality necessary to inflict these injuries formed a sufficient basis for the jury to reasonably infer that petitioner acted intentionally and with malice.* Thus, we reject this assignment of error.

*Id.* (emphasis added). As was the case in *Bowen*, this Court has reviewed the entirety of the trial transcript and concludes that the evidence was sufficient to establish beyond a reasonable doubt that the petitioner acted intentionally and with malice when she inflicted head trauma upon a defenseless baby, B.L. – head trauma so severe that it resulted in B.L.'s

28

death when she was barely thirteen months old. *See Guthrie*, 194 W. Va. at 663, 461 S.E.2d at 169, Syl. Pt. 3.

## IV. Conclusion

For the foregoing reasons, we affirm the petitioner's conviction. However, we reverse the determinate sentence imposed by the circuit court and remand this matter for resentencing pursuant to the applicable statute, West Virginia Code § 61-8D-2a(c).

> Affirmed in part; Reversed in part, and remanded with instructions.